Docket No. 100055.

**IN THE**
**SUPREME COURT**
**OF**
**THE STATE OF ILLINOIS**

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DAVID
A. HARI, Appellant.

*Opinion filed January 20, 2006.*

JUSTICE FITZGERALD delivered the judgment of the court,
with opinion.

Chief Justice Thomas and Justices Freeman, McMorrow,
Kilbride, Garman, and Karmeier concurred in the judgment and
opinion.

**OPINION**

Defendant David A. Hari admitted to shooting his wife and her
lover. The principal issue at defendant's trial was his culpability for
those shootings. Thus the evidence adduced concerned the opposing
issues of whether defendant planned the crime or whether defendant
was relieved of culpability due to purported involuntary intoxication
from his prescription Zoloft medication in combination with other
factors. The circuit court of Ford County denied defendant's proffered
involuntary intoxication instruction, finding Illinois law disallowed
such a defense in the absence of evidence that the defendant's
intoxication was the result of "trick, artifice, or force." The jury
thereafter found defendant guilty of the attempted first degree murder
of his estranged wife, Lisa Hari, and the first degree murder of her

lover, Jeff Thomas. The court sentenced defendant to 48 years' imprisonment on the murder count and a consecutive 25-year prison term on the attempt count. The appellate court affirmed. 355 Ill. App. 3d 449.

We do not decide here whether defendant is relieved of culpability due to the alleged side effects caused by the ingestion of Zoloft. Rather, we interpret the involuntary intoxication statute (720 ILCS 5/6–3 (West 2002)) and the evidence adduced at trial to determine if defendant was entitled to an involuntary intoxication jury instruction. We further consider issues related to the testimony of an in custody informant, Tracy Parker. Because we find that the jury should have been given an involuntary intoxication instruction, we reverse and remand for a new trial.

## BACKGROUND

Although the State introduced several witnesses presenting evidence of premeditation, we set out background facts and focus on the issues at hand relating to the involuntary intoxication and the testimony of the jailhouse informant, Tracy Parker. Lisa and defendant were married in 1989. They had two children, Zachary, 12 years old at the time of trial, and Kyle, six years old at the time of trial. Lisa was a daycare provider out of her house for six years. Defendant worked at a lumber yard. The family lived in a house in the central Illinois farm community of Paxton. Zack and his dad would often go hunting together, sometimes using a .22-caliber rifle. The couple had known Jeff Thomas and his wife, Julie Arnold Thomas, for approximately four years. The Thomases had two children: Jarrett, 13 at the time of trial, and Jordan, almost 11 at the time of trial. Lisa described the relationship with her husband around Christmastime of 2001 as "very distant," they "didn't spend much time together," and "were not getting along well." According to the record, Lisa became romantically involved with Jeff Thomas sometime prior to that Christmas. According to Lisa, on December 25, 2001, she told defendant of the affair. Lisa filed for a divorce from defendant on January 10, 2002.

On February 4, 2002, defendant went to see Dr. David John Hagan, a family physician. The doctor noted that defendant related that he was not sleeping and had lost weight, but was beginning to get

his weight back. Dr. Hagan felt defendant "was under significant stress and was depressed because of the stress he was going through in terms of his family life and the divorce." Defendant denied any suicidal thoughts or ruminations. The doctor admonished him not to drink alcohol and prescribed defendant a "starter pack" of Zoloft, an antidepressant, at 25 milligrams a day. Dr. Hagan started defendant on a lower dosage than he normally prescribed because of defendant's alcohol use since his separation from his wife. He also told defendant to call him if there were any side effects. Dr. Hagan did not know that defendant was taking any additional medication, nor did he warn him about combining Zoloft and Tylenol PM.

At approximately 6 p.m. on February 10, 2002, Lisa was on the telephone with her brother, Scott Sherfey. Lisa heard a noise in the basement which sounded like someone cocking a rifle. According to Scott, Lisa walked down to the basement and said, "Oh, my God, he is here." Defendant was coming out of the laundry room with the .22-caliber rifle. Defendant started firing as Lisa turned toward the staircase and tried to get away. Defendant shot Lisa three times in the left flank, upper right arm, and the right side of her head. Thomas arrived, and he stopped his truck in the driveway with the engine still running. Thomas was approximately 70 feet from defendant in the middle of the street in his naval reserve uniform. Defendant shot him four times from behind: in the left forearm, above the right buttock, in the back, and in the upper shoulder or neck area. The police apprehended defendant approximately three or four hours later in Roberts, Illinois. Defendant did not seem physically impaired to the police officers. Lisa was admitted to intensive care, underwent surgery, and was later released. Thomas died days later as the result of a severed carotid artery.

The State's information charged defendant with the offense of first degree murder (720 ILCS 5/9–1(a)(1) (West 2000)), alleging that he, without lawful justification and with the intent to kill or do great bodily harm to Jeff Thomas, shot Thomas causing his death. The State also charged defendant with attempted first degree murder (720 ILCS 5/8–4(a), 9–1(a)(1) (West 2000)), alleging that he, with the intent to commit first degree murder, performed a substantial step toward the commission of that offense by shooting Lisa Hari with a .22-caliber weapon without lawful justification and with the intent to kill.

˘3˘

Among the State's witnesses was Tracy Parker, an in-custody witness who shared a jail cell with defendant at the Ford County jail. Tracy Parker had a "long criminal record." He was convicted in 1992 of aggravated battery and in 1994 he was convicted of burglary and arson. In 2000, he was convicted of three counts of burglary. One of those 2000 counts involved a gun store, which led to the federal offense of possession of firearms by a felon. While serving the sentence on the federal charge, he was charged with the offense of conspiracy to escape. He was convicted in federal court of conspiracy to escape and was awaiting sentencing at the time of trial. Parker testified that defendant was his cellmate in Ford County jail for seven weeks, commencing on September 13, 2002. He testified that defendant was asking him to help him escape from prison. After a few weeks, defendant started talking about his case. Parker testified that defendant told him that he used to watch the house and his wife and Thomas enter and exit. Defendant stated the weekend he was moving out of the house he was angry because he had found pictures of Lisa in lingerie, wrapped in a towel, a picture of her blowing a kiss and pictures Thomas took of her. Defendant told him that he took a .22-caliber rifle out of a gun cabinet and hid it in a utility room in the basement, "so he could have it for later."

Defendant told him about the weekend of the shooting. According to Parker, defendant went to the house, retrieved the rifle, and waited in the basement for Lisa and Thomas to come home. Defendant told him that he shot Thomas and then he shot his wife. Defendant told him he accessed the house by borrowing some keys from an older religious lady that lived next door, and that he copied her key for his own use.

On cross-examination, Parker testified that he had pleaded guilty to the federal conspiracy to escape charge on October 30, 2002. On November 1, 2002, he approached corrections officers about defendant's case. Parker admitted that he was aware of discovery materials that defendant kept in the cell. At times, Parker was in the cell while defendant was not, and Parker admitted that he had the ability to look at the materials when defendant was away because there were no lockers. Parker acknowledged that his attorney discussed sentencing possibilities with him, but Parker claimed that cooperation in a state case could not help him receive a downward sentencing departure in the federal case. Parker testified, "It can't help

me either way." Parker testified that he did not expect anything in exchange for his testimony against defendant, nor was he promised anything. Parker denied that he wanted anything the day after his federal conviction when he contacted a correctional officer, Sargeant Sherfey, the sister of Lisa Hari.

Dr. Robert Mitrione testified on behalf of the defendant. In November 2002, defense counsel hired Dr. Mitrione to evaluate defendant's mental health. He testified that defendant's depression began with the knowledge that his wife was having an extramarital affair with Thomas. Defendant was not sleeping and was using alcohol regularly. He noted that Dr. Hagan diagnosed defendant with "depression" and that defendant's description of his symptoms conformed to "major depression" in the Diagnostic and Statistical Manual IV (DSM-IV).

He explained that Zoloft is a selective serotonin reuptake inhibitor (SSRI), designed to increase serotonin in the brain. It is "not unusual" for these medications to cause paradoxical or adverse reactions, depending on the patient. Dr. Mitrione also explained that the Zoloft package insert contained a listing of side effects which was an exact copy of the listing in the Physicians' Desk Reference (PDR). Dr. Mitrione testified that the stage at which adverse reactions most frequently occur is when medication is first taken or there is a change in dosage. Dr. Mitrione cited conflicting medical literature, some of which reports violent and suicidal adverse reactions at the beginning stage of taking Zoloft or SSRIs. Dr. Mitrione stated that the PDR contains a caution to mixing Zoloft with alcohol and other drugs that are metabolized in the liver. He testified that liver enzyme reduction or enzyme depletion can cause a toxic reaction.

Dr. Mitrione testified at length about his interview with defendant concerning the shootings. Defendant told him that on February 10, defendant had been on Zoloft for six days and had also been taking Tylenol PM. Tylenol PM has an active ingredient called diphenhydramine, which is an antihistamine commonly found in medications such as Benadryl. Dr. Mitrione testified that the PDR does not specifically warn of the combination of Zoloft and diphenhydramine. Dr. Mitrione explained, however, that diphenhydramine is officially used for allergies, but it is also a psychoactive that can be used for sedation. The PDR warns of the use

of Zoloft with some drugs that are metabolized in the liver, or use if the liver is otherwise impaired. The combination of Zoloft and diphenhydramine is problematic, therefore, because of this liver metabolism.

Dr. Mitrione testified that defendant told him that after he began taking Zoloft, he became more anxious, more intense, and his thinking became less clear. Dr. Mitrione testified that defendant's symptoms in those six days corresponded to the reactions listed on Zoloft's package insert and in the PDR. He stated that defendant suffered a litany of side effects including "agitation, trimmer [*sic*], abdominal discomfort, fatigue, tiredness, somnolence, and some confusion." He also experienced malaise, depression, "teeth grinding, chinning the jaw, emotional ability, abnormal dreams, paranoia reaction," and insomnia. Defendant also displayed some symptoms of akathisia–which is a kind of agitation "like an itch that can't be scratched"–which is indicated by tremulousness, restlessness, jaw clenching, pacing, or general nervousness. Akathisia has a mental component which intensifies worry and is very distracting to an individual. In the week before the shooting, defendant had "high depression, increased fatigue, increased malaise, increased agitation and then new symptoms were the jaw clinching, the nightmares, abdominal discomfort, tremulousness and some intensified ruminations and thought processes." Some of these symptoms, particularly the sleeplessness, were confirmed by some of defendant's family and coworkers at trial. Mitrione testified that defendant told him he developed a sense of things seeming strange and not being real, "like watching himself go through" things but not being part of it–"like it wasn't him."

Dr. Mitrione related what defendant told him about the events on February 10. Defendant told him he had been sleeping only one or two hours a night the week prior to the incident. On that day, he went back to the house to retrieve the .22-caliber weapon so he could later go hunting with his son. He had forgotten to take it with him when he packed because of the fight with his wife. "So he decided and somewhat illogically" that he had to get it without his wife knowing about it, because if his wife found out about it, she would use it against him in a custody dispute. The .22-caliber rifle was behind the water heater in the basement. Defendant said he put it there because there is a "crazy guy in the neighborhood that he didn't trust."

Defendant also said there was a rottweiler in the neighborhood. In Dr. Mitrione's words, defendant described the shootings like a "fuzzy dream." Dr. Mitrione testified that defendant told him:

> "She you know, made some unpleasant remarks to him and somewhat threatening remarks, and he said the gun just started going off, and that at the time it didn't seem like it was–it's my word neutral. He didn't describe it that way, but at the time it didn't seem right. It didn't seem wrong. It just was, and that it was, it was like he was watching himself go through the motions; that he went on. *** [He left] and Jeff Thomas happened to be pulling in the driveway at the same time, and the same sort of event occurred. Thomas started complaining at him, and, again, the firearm just started going off. He didn't recall leaving the scene, didn't recall too much except that he was out driving around the country."

Dr. Mitrione opined that defendant's impaired memory was not unusual.

Dr. Mitrione diagnosed defendant with "major depression, alcohol dependence," and a "probable paranoid personality disorder." Mitrione explained that people with a paranoid personality disorder are very suspicious, rigid thinkers and more susceptible to adverse drug reactions. Dr. Mitrione opined that, to a reasonable degree of medical and psychiatric certainty, defendant suffered from involuntary intoxication from the adverse effects of the combination of Zoloft and diphenhydramine, with the lack of sleep, major depression, and alcohol dependency as contributing factors. Dr. Mitrione further opined, to a reasonable degree of medical and psychiatric certainty, that the involuntary intoxication deprived him of the substantial capacity to appreciate the criminality of his acts or conform his conduct to the requirements of the law at the time of the shooting. Defendant's intoxication was involuntary because:

> "Mr. Hari went through things that were fairly reasonable that most any person would do in terms of addressing his problem, at least, from kind of a medical basis. He looked for some sleeping medication that would be helpful to aid his sleeping and Tylenol PM is promoted as a sleep aid. He tried that. *** He still didn't experience any relief. He followed up with a visit to his physician who prescribed him some medicine, you

> know, with the encouragement. It may not work right away, but after a little while, you are going to feel better. Certainly, he had every expectation to think that he would feel better."

Dr. Mitrione testified that his diagnosis of "involuntary Zoloft intoxication" was a recognized disease, defect, or derangement within DSM-IV. However, the word "intoxication" is misleading because it does not have to do with alcohol, but rather is a toxic reaction. Dr. Mitrione explained that an adverse drug reaction would affect an individual's perception of events, but, in contrast to alcohol intoxication, it would not result in slurred speech or the inability to drive or walk in a straight line.

Defendant also submitted into evidence the package insert for the Zoloft. This insert consists of a 9½-inch by 16-inch two-sided sheet, containing four columns on each side, typed in fine print and depicting several tables. One section discusses events observed during the clinical trials of over 4,000 subjects during the premarketing assessment of Zoloft. According to the insert, "It is important to emphasize that although the events reported occurred during treatment with ZOLOFT, they were not necessarily caused by it." The insert states, "infrequent adverse events are those occurring in 1/100 to 1/1000 patients." Under the subheading "psychiatric disorders," infrequent adverse events listed include "depression, amnesia, paroniria, teeth-grinding, emotional lability, apathy, abnormal dreams, euphoria, paranoid reaction, hallucination, aggressive reaction, aggravated depression, [and] delusions."

Dr. Robert Chapman testified as a rebuttal witness on behalf of the State. Defendant's first attorney, the Ford County public defender, hired Dr. Chapman to examine defendant on March 27, 2002. He was directed to examine defendant for any psychiatric findings, but particularly for sanity. Dr. Chapman administered a multiple-choice psychiatric test and also conducted a two hour face-to-face examination. Chapman found that defendant suffered impaired concentration, rumination, and increased drinking after his wife had the extramarital affair. He made several diagnoses after the March 27, 2002, exam. He diagnosed defendant with the following disorders: personality disorder not otherwise specified, with obsessive compulsive and attention deficit disorder features; adjustment disorder or unadjusted-to stress with depressed mood; and social

anxiety disorder or painful shyness, fear, and anxiety of being around strangers. Dr. Chapman found that defendant was tense, irritable, preoccupied, very angry, depressed, and full of resentment and rumination over his problems, had suicidal thoughts, strong feelings of inadequacy, uncertainty about the future, and a tendency to misunderstand the motives of others. He noted that defendant also had an adjustment disorder with a depressed mood in 1988 following a stressful situation. Dr. Chapman testified that defendant's paranoid personality feature has been present since he was 18 years old. As to the question of legal insanity, Dr. Chapman opined that defendant was not impaired by any mental disease, defect, or condition to cause him to lack substantial capacity to appreciate the criminality of his conduct.

Defendant related his history with Zoloft to Dr. Chapman. According to Dr. Chapman, Zoloft is part of the new generation of antidepressants. He testified that it has a very favorable "side effect profile," meaning that, in general, patients have few side effects, if any. This helps with efficiency and compliance in taking the drug because patients are more likely to take it if there are no side effects. Twenty-five milligrams a day for a week is a typical starting, subtherapeutic dose. By the time of the interview, March 27, 2002, defendant had been taking the 50-milligram dosage for several weeks because he continued to take the drug after the shootings and he had begun to feel some relief from his depression. Defendant did not mention any side effects from the Zoloft. Defendant did not mention that he had taken Tylenol PM at any time before the shootings. The doctor was not aware of any adverse reactions between Zoloft and Tylenol PM's ingredient diphenhydramine. Chapman admitted that diphenhydramine impacts the enzymes of the liver. Chapman agreed that Zoloft can have some paradoxical side effects in 1% or fewer of all users, and a low dose could produce adverse reactions in some individuals. Chapman admitted that restlessness and pacing are indicative of akathisia, a movement disorder, and that akathisia, gastrointestinal problems, restlessness, depersonalization, irritability, personality changes, hostilities and paranoia symptoms can develop while a patient is on Zoloft.

At the March 27 interview, Dr. Chapman did not evaluate defendant for involuntary intoxication or consider whether involuntary intoxication deprived defendant of his ability to conform

his conduct to the law. However, he did evaluate whether the mental disorder was from a toxic substance, drug, or alcohol. Dr. Chapman stated, "What [defendant did] *** was not consistent with any toxic reaction to any medicines or any other substance." On redirect, Dr. Chapman testified that defendant told him that he went to the house that day to retrieve the rifle because he had earlier forgotten it when he moved out. He also stated that defendant simply said with regards to the shooting that "it was kind of vague to him." Dr. Chapman stated that it "is not uncommon for people involved in an acute stressful situation, to have very, very sketchy memory about some of the events. That's not uncommon, and that was this case too."

Dr. Hagan also testified as a rebuttal witness. Dr. Hagan did not know that defendant was also taking Tylenol PM, which contains diphenhydramine. The Zoloft starter pack is a sample pack that contains a 25-milligram dosage for the first seven days of use. The first week on Zoloft is generally considered "subtherapeutic" because the 25-milligram dosage acclimates the body to the drug, but does not yet act as an antidepressant on the patient. Dr. Hagan started him on a lower dosage than he normally prescribed because of defendant's increased alcohol use since his separation from his wife. Dr. Hagan was not aware of any adverse affects of the combination of Tylenol PM and Zoloft. He generally disapproved of Tylenol PM. He was also unaware of adverse affects of Zoloft with drugs that affected liver enzymes. It was beyond his expertise as to how the body metabolized diphenhydramine. In his experience, he had no knowledge of Zoloft causing involuntary intoxication. In the doctor's 2000 PDR, he could find no drug interaction between diphenhydramine and Zoloft.

At the jury instructions conference, defense counsel tendered jury instructions for an affirmative defense of involuntary intoxication. See 720 ILCS 5/6–3 (West 2002). The court found that the issue of intoxication was raised by defendant's evidence and expert testimony. The trial court, however, denied the requested instruction, stating that the involuntary intoxication may only be due to "trick, artifice, or force," following the existing case law cited by the State of *People v. Downey*, 162 Ill. App. 3d 322 (1987), *People v. Larry*, 144 Ill. App. 3d 669 (1986), and *People v. Walker*, 33 Ill. App. 3d 681 (1975). The trial court instructed the jury on the defense of insanity, and, following closing arguments, the jury found defendant

guilty of first degree murder and attempted first degree murder.

On November 26, 2002, the day after the jury returned verdicts of guilty against defendant, Ford County State's Attorney Tony Lee wrote a letter to an assistant United States Attorney handling Parker's federal case. Lee's letter stated that while no requests or promises were made, he "wanted to make [the federal prosecutor] aware of Parker's assistance" in defendant's trial. Lee stated: "Parker was helpful and cooperative and provided useful information in our successful prosecution of the defendant."

In December 2002, defendant filed a motion for judgment of acquittal or for a new trial. Defendant argued that the court improperly refused to instruct the jury on involuntary intoxication, and the court improperly restricted defendant's cross-examination of Tracy Parker concerning how much good time he could accrue on his state and federal sentences for cooperation. The trial court denied the motion. The trial court sentenced defendant to 48 years in prison on the murder count and a consecutive term of 25 years on the attempted first degree murder count. In February 2003, defendant filed a motion to reconsider, which the court denied.

The appellate court affirmed. 355 Ill. App. 3d 449. After finding that the involuntary intoxication statute was ambiguous, the court nevertheless set forth the dictionary definition of "involuntarily," and stated "that intoxication caused by an unexpected adverse reaction to prescribed medication falls within the ordinary meaning of the term 'involuntarily produced.'" 355 Ill. App. 3d at 459. It held, "When evidence is presented showing a defendant ingested prescribed medication and suffered an adverse reaction whereby he was unable to control his own will when he committed a criminal act, a defendant is entitled to a jury instruction on the defense of involuntary intoxication." 355 Ill. App. 3d at 459. The appellate court, however, found that the failure to give a tendered instruction on this affirmative defense was harmless error, because its review of the record demonstrated that the State had presented clear and convincing evidence rebutting the affirmative defense. 355 Ill. App. 3d at 459. The appellate court additionally found that defendant forfeited the argument that his convictions must be reversed because the State failed to correct Tracy Parker's assertion that he had nothing to gain from his testimony because he did not raise the issue in his posttrial

motion. 355 Ill. App. 3d at 461. The appellate court also rejected defendant's argument that the trial court denied him his constitutional right to cross-examine Parker about his motive to lie. The appellate court held that even if this was error, defense counsel was given adequate latitude to establish Parker's alleged bias. 355 Ill. App. 3d at 463. Thus, any error was harmless beyond a reasonable doubt. 355 Ill. App. 3d at 463. We granted defendant's petition for leave to appeal. See 177 Ill. 2d R. 315(a). On the law issues before us, our review proceeds *de novo*. *People v. Willis*, 215 Ill. 2d 517, 524 (2005).

## ANALYSIS

We first address whether the Criminal Code of 1961 permits the defendant's instruction pertaining to involuntary intoxication.

Illinois law provides for an affirmative defense where conduct is produced by an intoxicated or drugged condition. 720 ILCS 5/6–3 (West 2002). The Code provides:

> "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." 720 ILCS 5/6–3 (West 2002).

Defendant argues that intoxication resulting from the unexpected and unwarned adverse side effects of medication prescribed by a physician falls within the plain meaning of the term "involuntarily produced" in the statute. Further, according to defendant, the trial court's limit of this language to trick, artifice, or force is too narrow. The State responds that the term is not defined in the Code. Further, according to the State, the term "involuntarily produced" can be reasonably interpreted to "both include and exclude" unwarned side effects of prescription medication voluntarily taken as directed. The State points to previous case law interpreting involuntary intoxication as strictly encompassing intoxication induced only by an outside influence such as trick, artifice, or force as support for this alternate narrow interpretation. We agree with defendant.

The cardinal rule of statutory construction is to give effect to the intent of the legislature. *People v. Blair*, 215 Ill. 2d 427, 442 (2005).

˘12˘

The best evidence of legislative intent is the language used in the statute, which must be given its plain and ordinary meaning. *Blair,* 215 Ill. 2d at 442-43. It is never proper for a court to depart from plain language by reading into the statute exceptions, limitations, or conditions which conflict with the clearly expressed legislative intent. *Blair*, 215 Ill. 2d at 443. If the plain language reveals legislative intent, we will give that intent effect without resorting to other interpretive aids. *People v. Roberts*, 214 Ill. 2d 106, 116 (2005).

We find that the drugged condition alleged here–an unexpected adverse side effect of a prescription drug that was unwarned by the prescribing doctor, the PDR or the package insert–is "involuntarily produced" within the plain meaning of the involuntary intoxication affirmative defense statute. In the absence of a specific definition of the word "involuntarily," we assume that the legislature intended the word to have its ordinary and popularly understood meaning. *People v. Ward*, 215 Ill. 2d 317, 325 (2005). Webster's Third New International Dictionary defines "involuntary" as "springing from accident or impulse rather than conscious exercise of the will." Webster's Third New International Dictionary 1191 (1993). Black's Law Dictionary defines "involuntary" as "[n]ot resulting from a free and unrestrained choice; not subject to control by the will." Black's Law Dictionary 833 (7th ed. 1999). We note that the State ignores the dictionary definition of "involuntarily," and makes no argument thereto. Further, we reject the State's argument that the phrase "involuntarily produced" requires further definition in the Code. An unexpected and unwarned adverse effect of a drug taken on doctor's orders falls within the ordinary and popularly understood definition of "involuntarily." Thus, the unexpected and unwarned adverse effect is not a conscious effect of a defendant's will, is not resulting from a defendant's free and unrestrained choice, and is not subject to control of defendant's will.

We additionally reject the State's citation of several decisions of our appellate court, claiming they support the restriction of the plain meaning of "involuntarily produced" to trick, artifice, or force. The overly restrictive interpretation underlying those courts' denial of an involuntary intoxication instruction may be due to their distinguishable facts. The cases did not determine whether the phrase "involuntarily produced" encompassed, as here, a defendant's adverse drugged condition resulting from the ingestion of drugs according to

doctor's orders. *People v. Downey*, 162 Ill. App. 3d 322, 335 (1987) (defendant claimed his action was involuntary because he was addicted to cocaine); *People v. Gerrior*, 155 Ill. App. 3d 949, 953 (1987) (defendant knew the nature of the medicines and Antabuse he was taking and was told by his physician of a potential extreme reaction when taken with alcohol); *People v. Larry*, 144 Ill. App. 3d 669, 677-78 (1986) (defendant smoked marijuana which he saw another person put white powder on); *People v. Walker*, 33 Ill. App. 3d 681, 688 (1975) (defendant received pills containing Seconal from his brother and consumed alcohol). Each of those situations lacked the kind of "external influence" on the cause of a defendant's drugged condition that defendant's evidence propounded here. In each of those cases, the defendant's drugged condition was a result of the defendant's conscious choice.

Further, the standard utilized by those cases derives from the predecessor statute to the one at issue here. *Walker*, 33 Ill. App. 3d at 688, quoting *People v. Bartholomew*, 104 Ill. 601, 606 (1882), quoting Ill. Rev. Stat. 1874, ch. 38, par. 291 ("Drunkeness shall not be an excuse for any crime or misdemeanor, unless such drunkeness be occasioned by the fraud, contrivance or force of some other person, for the purpose of causing the perpetration of an offense"); *Larry*, 144 Ill. App. 3d at 676-77 (the " 'trickery, fraud and deceit' " standard was set forth in *Walker* which relied on *Bartholomew* which set forth the predecessor statute).

We note, however, that we have reached a contrary legal conclusion in *People v. Rogers*, 123 Ill. 2d 487 (1988). In our one paragraph consideration of this issue, we stated, "We agree with the appellate decisions indicating that the General Assembly, in using the expression 'involuntary intoxication,' was contemplating intoxication induced by some external influence such as trick, artifice or force." *Rogers*, 123 Ill. 2d at 508. Nevertheless, our decision suffered from the same infirmity as the appellate decisions of being derived from the predecessor statute. Additionally, the intoxication in that case did not result from adverse affects of drugs prescribed by a physician but from a defendant's multiple drug addiction. To the extent that *Rogers*, *Downey*, *Gerrior*, *Walker*, and *Larry* can be read as excluding the unexpected and unwarned adverse side effects from medication taken on doctor's orders from the plain meaning of "involuntarily produced," they are overruled.

We thus reject the State's limited interpretation of the plain meaning of "involuntarily produced" to trick, artifice, or force as too narrow. While the State is correct that the phrase "involuntarily produced" may also subsume the meaning of "fraud, contrivance or force," there is nothing in the statute which dictates that it must be limited to this meaning. It is never proper for a court to depart from plain language by reading into the statute exceptions, limitations, or conditions which conflict with the clearly expressed legislative intent. *Blair*, 215 Ill. 2d at 443. We further do not address the State's argument as to the committee comments to the statute. Because we find that the plain language of the statute reveals legislative intent, we need not resort to other interpretive aids. *Roberts*, 214 Ill. 2d at 116.

Turning to the matter at hand, the record reveals evidence entitling defendant to an instruction pursuant to section 6–3 of the Code (720 ILCS 5/6–3 (West 2002)). Involuntary intoxication is an affirmative defense which would exculpate an accused if the trier of fact believed that the elements of involuntary intoxication had been proven. 720 ILCS 5/6–3, 6–4 (West 2002)). The Criminal Code of 1961 provides that an affirmative defense "means that unless the State's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, must present some evidence thereon." 720 ILCS 5/3–2(a) (West 2002). If an affirmative defense is raised, "then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense." 720 ILCS 5/3–2(b) (West 2002).

Here, the record reveals defendant raised the issue of involuntary intoxication by presenting "some evidence" that his drugged condition was involuntarily produced and deprived him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. 720 ILCS 5/6–3 (West 2002). The most critical of this evidence was Dr. Mitrione's opinion testimony, to a reasonable degree of medical and psychiatric certainty, that at the time of the shooting defendant suffered from involuntary intoxication in the form of a drugged condition caused by some combination of Zoloft and diphenhydramine, with his lack of sleep and previous alcohol dependency as contributing factors. Dr. Mitrione further opined to a reasonable degree of medical and psychiatric certainty that defendant, as a result of this involuntary intoxication, lacked the substantial capacity to appreciate the

criminality of his acts or conform his conduct to the requirements of the law. The jury had the right to accept or reject Dr. Mitrione's opinion in considering the validity of defendant's affirmative defense. Accordingly, the trial court erred in failing to instruct the jury on involuntary intoxication.

The State next argues that the failure to give a jury instruction was harmless error not requiring reversal. The State points to evidence in the record which it contends demonstrates overwhelming evidence of defendant's guilt of attempted first degree murder and first degree murder. We disagree.

This court has held that where there is some evidence to support an affirmative defense instruction, the trial court's refusal to instruct the jury constitutes an abuse of discretion even if the evidence is conflicting. *People v. Jones*, 175 Ill. 2d 126, 131-32 (1997). Very slight evidence upon a given theory of a case will justify the giving of an instruction. *Jones*, 175 Ill. 2d at 132. Furthermore, fundamental fairness includes, among other things, seeing to it that certain basic instructions, essential to a fair determination of the case by the jury, are given. *People v. Ogunsola*, 87 Ill. 2d 216, 222 (1981). The failure to inform the jury of the elements of a crime charged has been held to be a grave and fundamental error. *Ogunsola*, 87 Ill. 2d at 222. "In essence, unless the evidence before the trial court is so clear and convincing as to permit the court to find as a matter of law that there is no affirmative defense, the issue of whether a defendant should be relieved of criminal liability by reason of his affirmative defense must be determined by the jury with proper instruction as to the applicable law." *Jones*, 175 Ill. 2d at 132. When the evidence raises the basis for the instruction, a trial court's refusal results in a denial of defendant's due process and entitles a defendant to a new trial. *Jones*, 175 Ill. 2d at 134.

Because the defense evidence raised the affirmative defense, the State held the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all other elements of the offense. 720 ILCS 5/3–2 (West 2002). Yet, no instruction was given that addressed the defense evidence. The jury, therefore, was not informed that the evidence presented by defendant could provide a defense to murder and attempted murder. The jury also was not informed that the prosecution had the burden of proving beyond a

˘16˘

reasonable doubt that defendant was not involuntarily intoxicated. This omission "removed from the jury's consideration a disputed issue essential to the determination of defendant's guilt or innocence." *Ogunsola*, 87 Ill. 2d at 223. Ultimately, it was for the jury to weigh the evidence in determining whether the defendant suffered involuntary intoxication such that he lacked substantial capacity to appreciate the criminality of his acts or conform his conduct to the requirements of the law. The jury therefore lacked the necessary tools to analyze the evidence fully and to reach a verdict based on those facts. See *Jones*, 175 Ill. 2d at 134. Such an error is a denial of due process and requires that defendant be granted a new trial. *Jones*, 175 Ill. 2d at 134.

We find the State's proffered cases regarding the instant issue, failure to instruct on an affirmative defense, inapposite. First, *People v. Ward*, 187 Ill. 2d 249 (1999), and *People v. Johnson*, 146 Ill. 2d 109 (1991), do not address the complete failure to instruct the jury on an affirmative defense. In *Ward*, two instructions, one of which was ambiguous, and one of which was crystal clear, were submitted on the intent element of murder. *Ward*, 187 Ill. 2d at 265-66. We stated, "Reading both instructions together, as the jury was instructed to do, the jury simply could not have convicted defendant of both murders on a finding of fewer than all of the elements required for each victim." *Ward*, 187 Ill. 2d at 266. Similarly, in *Johnson*, we found that it was harmless error to give guilty but mentally ill instructions which required that defendant be found to be sane by a preponderance of evidence rather than requiring proof of defendant's sanity beyond a reasonable doubt. *Johnson*, 146 Ill. 2d at 136. The defendant in *Johnson* was not prejudiced, as the erroneous instruction made a guilty but mentally ill verdict easier to reach than a proper instruction would have, yet the jury declined to reach that verdict. *Johnson*, 146 Ill. 2d at 138. These cases, however, do not address the present situation, namely, the complete lack of any instruction on an element raised by the defense evidence.

While the State's additional citation of *People v. Ward*, 32 Ill. 2d 253 (1965), concerns the failure to instruct the jury on a defendant's affirmative defense, it is also readily distinguishable. There, we found "[n]one of the evidence complained of is specified [by defendant], nor is any one of the instructions objected to set forth in the brief." Further, there was "nothing" in the record to support the defendant's

proffered affirmative defense of provocation. *Ward*, 32 Ill. 2d at 256. Here, as stated, there is at least "some evidence," in the form of Dr. Mitrione's testimony, to support defendant's affirmative defense of involuntary intoxication. Even very slight evidence upon a given theory of a case will justify an instruction. *People v. Jones*, 175 Ill. 2d at 132.

Because we find that defendant should have received an instruction as to his affirmative defense of involuntary intoxication, we therefore reverse and remand for a new trial on this basis.

We next examine defendant's remaining issues regarding the testimony of Tracy Parker to determine if they are likely to recur on remand. *People v. Fuller*, 205 Ill. 2d 308, 346 (2002) (on review, once it is decided that a new trial is required, additional claims of error may be addressed if they are likely to arise again in the course of retrial). Defendant first argues that the State failed to correct Tracy Parker's testimony that his cooperation could not help him with his upcoming federal sentencing. Of relevance is the following testimony by Parker on cross-examination by defense counsel:

> "Q. You are also aware of the provision of the federal sentencing guidelines that allows the Court when you are sentenced to give a substantial departure downward if you cooperate with authorities in turning somebody else's offense; right?
>
> A. Not when it deals with state cases, no.
>
> Q. Federal cases; right?
>
> A. Just federal cases, yes.
>
> Q. That's correct. And you are pending sentencing in Federal Court shortly; aren't you?
>
> A. Yes.
>
> Q. And through your understanding in the federal system you are aware that there is the potential for, Judge McCuskey down here in Federal Court when it comes for sentencing to say, hey, he is a good guy; he cooperated with authorities in turning a case for us in Ford County and get you a reduction in time; is that right?
>
> A. I was aware of that. You can get a departure from your sentence; it had to do with the federal sentences. I was told I

couldn't get anything from the state case. It had nothing to do with me federally. So it can't help me either way."

The day after the jury returned the verdicts against defendant, the prosecuting State's Attorney sent a letter to the assistant United States Attorney handling Parker's federal case. It said,

> "I'm writing to advise you that Tracy Parker was subpoenaed and testified in the captioned Ford Co. murder trial. Parker was helpful and cooperative and provided useful information in our successful prosecution of defendant. This will also confirm that I made no promises whatsoever to Parker, and he requested nothing in exchange for his cooperation. Notwithstanding this, I still wanted to make you aware of Parker's assistance in our case."

The supplemental record reveals that Parker subsequently requested a downward sentencing departure based on his substantial assistance in the present matter, noting the letter. This request was unsuccessful. Here, defendant argues that the above facts demonstrate that Tracy Parker lied concerning his hopes to receive a benefit for testifying at the trial and that the prosecutor failed to disclose this letter.

Given that defendant will receive a new trial, requiring Parker to testify again, and defendant now has the letter in his possession and may bring it to the attention of the jury, we find that this issue is not likely to occur on remand. Thus, we need not address it further.

Defendant next asserts that the trial court erred in limiting his cross-examination of Parker about his hope to obtain good-time credit on his state sentences. The record reveals many questions, objections, and rulings by the trial court with regard to both Parker's state and federal sentencing. Because we find that this issue is likely to occur on remand, we address it.

We disagree with defendant on the underlying reading of the record, rather than the legal import of the argument. The record reveals that the court reserved rulings on counsel's questioning of Parker to circumstantially demonstrate the specific length of time Parker could hope to be reduced from his sentences. The court, however, did not prohibit defense counsel from inquiring generally about the good-time credit he hoped to receive. The record shows the following colloquy to be among the questions on this issue between defense counsel and Parker:

"Q. On the State charges you said there was good time. Could you get on the State charges that are pending and that you are going to serve; is that right?

A. My State and Federal times run concurrent.

Q. But you can get good time on the state charges, likewise; can't you?

A. The same as everybody else, yes.

Q. Un-huh. So if you cooperate and if you behave, you can expect a reduction in you are [*sic*] State charges or you are [*sic*] State sentence?

A. I don't know about reduction. Everybody does a certain amount of time, if you don't get in trouble while you are in prison.

Q. That's my point. That's correct?

A. Exactly.

Q. Okay, no further questions, Judge.

COURT: Okay. Then I am going to rule on my reserved objections, and I am directing the jury to disregard the questions and answers about the 10 years and 150 months and their connection to whether or not he can obtain good time for testifying in this case. That's all that's stricken. You are ordered to disregard it."

The judge's reference to "10 years" concerns the sentence Parker received for burglary in the year 2000; the "150 months" referred to his 2000 federal sentence for possession of a firearm. Although the record is much less than a picture of clarity with regards to the specific arguments and rulings on this issue, we find that as a whole, the record reveals that defendant was able to conduct an adequate cross-examination of Parker's expectation of good-time credit. Therefore, we agree with the appellate court that the record reveals that the trial court did not improperly restrict Parker's testimony regarding good-time benefits on state charges. Rather, the trial court limited questioning only as to the length of the sentences, which was already before the jury, and of which defendant does not complain before this court. Because we find that the record does not bear out the basis of defendant's argument, we find no error.

Accordingly, we reverse defendant's convictions for attempted

˘20˘

murder and first degree murder and remand for a new trial.

## CONCLUSION

For the foregoing reasons, the judgments of the appellate court and circuit court are reversed, and the cause is remanded to the circuit court for a new trial.

*Reversed and remanded.*