NOTICE
Decision filed 12/21/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200315-U

NO. 5-20-0315

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Johnson County. |
| | ) | |
| v. | ) | No. 15-CF-41 |
| | ) | |
| DENNIS F. M. SCHAPMIRE, | ) | Honorable |
| | ) | James R. Williamson, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held*:   We reverse the defendant's convictions for first degree murder where the trial court erred in failing to instruct the jury on the lesser-included offense of involuntary manslaughter as there existed some evidence in the record which, if believed by the jury, would tend to prove the lesser rather than the greater crime.

¶ 2     On July 28, 2020, after a six-day jury trial, the defendant, Dennis F. M. Schapmire, was convicted of two counts of first degree murder, in violation of sections 9-1(a)(1) and 9-1(a)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1), (a)(2) (West 2014)), and one count of aggravated battery with a firearm, in violation of section 12-3.05(e)(1) of the Code (*id.* § 12-

1

3.05(e)(1)). On September 16, 2020, the defendant was sentenced[1] to 50 years' confinement in the Illinois Department of Corrections.

¶ 3     The defendant now appeals his convictions and sentence arguing that the trial court erred in failing to instruct the jury on the lesser-included offense of involuntary manslaughter and erred in considering the victim's suffering as an aggravating factor at sentencing. For the following reasons, we reverse the defendant's convictions and sentence.

¶ 4                              BACKGROUND

¶ 5     It is undisputed that on May 16, 2015, the defendant shot his father, Nicholas G. Schapmire (Nick), with a .357 Magnum revolver. The bullet entered Nick's right upper cheek and exited his right temple, resulting in a large acute subdural hematoma. Nick died as a result of the injury on May 17, 2015. He was 66 years old at the time of his death.

¶ 6     The defendant testified at trial that he lived with his parents and that, on the day of the incident, he had returned from checking on his horse and entered the house. The defendant stated that he was armed with a .357 Magnum revolver that he had taken out of his truck and placed in his jacket, but that he believed he had taken the gun out of his jacket prior to entering the house. The defendant stated that he also had a 9-millimeter Kel-Tec pistol and a .22 North American Arms revolver in his jacket.

¶ 7     The defendant testified that his father was lying in bed watching television when the defendant went in to discuss that his truck had been "messed with," that morning, and that he was angry towards his brother because he believed that his brother was the individual "messing" with

---

[1]Under the doctrine of one act/one crime, which provides that a court shall not impose consecutive sentences for offenses when those offenses are based on the same physical act, the defendant was sentenced on one count of first degree murder. See *People v. Coats*, 2018 IL 121926, ¶ 11; *People v. King*, 66 Ill. 2d 551, 566 (1977).

2

his truck. The defendant stated that he told his father that he was angry with his brother, and his father had responded that he did not believe that the defendant's brother was messing with the defendant's truck. The defendant testified that his father had stated that the defendant was "crazy for thinking that he was messing with my truck." The defendant testified that he was not feeling mad or upset at his father's statement because his father tended to "overreact and exaggerate." The defendant acknowledged that, in his statement to law enforcement, he had stated that his father had said "crazy, crazy, crazy."

¶ 8     The defendant testified that he informed his father that he was going over to his brother's house, but "before all that, I had—somehow had—I had cocked[2] the gun." According to the defendant's testimony, it was common for he and his father to "cock and uncock guns." The defendant further testified that, prior to stating that he was going to his brother's house, his father had stated, "No, no, don't." The defendant stated that he "wasn't doing anything" and that the gun was pointed at the ground when his father had stated, "No, no, don't." The defendant testified that he believed his father had made that statement in response to the defendant stating that his brother was messing with his truck.

¶ 9     After the defendant told his father that he was going to his brother's house, his father responded with something that the defendant could not recall. The defendant testified that he stated to his father, "I better uncock this gun before it goes off or before it discharges," and "then I started to go left, and then for some reason, I went right. And then the gun discharged, and it shot him." According to the defendant's testimony, the gun discharged because his thumb "slipped off the

---

[2]A firearm is commonly referred to as "cocked," when the hammer/striker of the weapon is placed into a spring-loaded ready position.

hammer" when he was attempting to uncock it. The defendant described the discharge of the weapon as follows:

> "You have to put your thumb on the hammer to uncock it and put your finger on the trigger. Well, my thumb slipped off of the hammer, and then the gun discharged."

¶ 10    The defendant testified that, during his interview with law enforcement, he had a difficult time remembering things because he had a short-term memory, and the interview was conducted approximately four hours after the incident. The defendant testified that he stated, "many times," to law enforcement that the shooting was accidental. The defendant further testified that he had no intention of killing his father when he had entered the bedroom.

¶ 11    The defendant went on to testify that he left the residence after the incident because his mother was on the phone with 911 and he got scared. The defendant acknowledged that his father was in poor health, that his father was not holding any weapons, and that his father was not threatening him at the time of the incident. The defendant also acknowledged that he had received basic firearm safety training when obtaining his concealed carry permit and that he had used firearms since he was a teenager.

¶ 12    The only other person in the home at the time of the incident was the defendant's mother, Shirley Schapmire. Shirley testified at trial that she and Nick had been married for 45 years at the time of his death and that the defendant was one of their three sons. Shirley identified her sons, in order of oldest to youngest, as Nicki, Jason, and the defendant.

¶ 13    On the day of the incident, Shirley testified that she and Nick had run some errands and returned home shortly after lunch. She stated that when they returned home, Nick "pulled his britches off and went and laid down on the bed" to watch television. Shirley stated that she sat on the side of the bed talking to her sister on the telephone, and then went into the closet to select

clothing as they were going to attend their grandson's high school graduation. Shirley described the closet as "around 5 or something feet wide" and ran the length of the bedroom. Shirley stated that the closet did not have a door but did have a curtain over the closet's doorway.

¶ 14    Shirley testified that she was unsure how long she had been in the closet when she heard a gunshot. Shirley stated that, upon hearing the gunshot, she was so scared that she could not move, and that it "took me a while to make myself come out to see what happened." Shirley testified that, when she came out of the closet, she looked at Nick and saw a spot on his head. Shirley stated that only Nick was in the room when she came out of the closet, but that the defendant then entered the room. Shirley stated that the defendant stood between the foot of the bed and the closet, that he had something black in his hand, and that she could not remember him saying anything. Later in her testimony, Shirley stated that the defendant was asking about his dad.

¶ 15    The State then played an audio statement that Shirley had given to law enforcement. After hearing the audio statement, Shirley testified that the defendant was standing in the bedroom in shock when she came out of the closet and that the defendant had stated, "Well, it was an accident." Shirley acknowledged that in the audio statement, she had stated that she had heard the defendant and Nick talking, but at trial, Shirley stated that she could not remember them talking. Shirley also stated that Nick had something black in his hand, but that she could not identify it, because she was concerned about Nick. Shirley stated that it "probably was" a gun.

¶ 16    On cross-examination, Shirley testified that she was at the hospital and very upset when she had spoken with law enforcement. Shirley stated that she was not thinking about what she was saying because she was trying to locate her husband. Shirley testified that, when she came out of the closet, the defendant was "standing there in shock and horror," and then the defendant left the room. Shirley stated that she believed the defendant went to his grandparents' graves because that

5

was normally where he went when he was upset. Shirley further testified that "there's no way in this world [the defendant] would ever hurt his dad."

¶ 17    Jon Gulley, a Johnson County sheriff's deputy, testified at trial that he responded to a call regarding a possible fight at the Schapmires' residence on the day of the incident. Gulley stated that, when he arrived, he observed a white male, who was identified as Nicki, coming out of the residence. Gulley testified that Nicki stated, " 'I need an ambulance. My dad's been shot.' " Based on that statement, Gulley stated that he entered the home, went to the bedroom where Nick was located, and observed Nick lying towards the center of the bed with two females on either side of him. Gulley stated that he cleared the room, meaning he searched the room, including the bed and under the bed, for a weapon or anyone with a weapon, and did not locate any weapon in the room. Gulley stated that he advised the females that an ambulance was in route and then advised the ambulance of the situation.

¶ 18    Gulley testified that when he went outside of the home, he observed Nicki on his phone arguing with someone to return to the residence. When Gulley asked Nicki to whom he was speaking with, Nicki identified the defendant. Gulley then asked Nicki to speak with the defendant and Nicki handed him the phone. Gulley testified that he identified himself as law enforcement to the defendant and that the defendant "was kind of—a little bit hysterical on the phone saying, 'I accidently shot my father. It was an accident.' " Gulley stated that the defendant made that statement several times and that Gulley asked the defendant to calm down and return to the residence, which the defendant agreed to do. Gulley testified that the defendant returned to the residence and was taken into custody. Finally, Gulley stated that he remained at the residence while the scene, including the defendant's vehicle, was processed.

¶ 19    Sergeant Chad Brown, who was employed with the Illinois State Police (ISP) on the date of the incident, testified at trial that he was a sergeant in the investigation unit at the time of the incident and that he, and another member of the ISP, conducted a recorded interview with the defendant on May 16, 2015. Brown stated that interview was conducted at approximately 5:18 p.m. and that it lasted approximately 1½ hours. Brown identified the other member of the ISP involved in the interview as Special Agent Mark Stram.

¶ 20    Brown testified that, during the interview, the defendant had stated that he had woken up that morning and his parents were not at home. The defendant stated that he went to check on his horse and, while he was outside, he had noticed that a mirror on his truck had been pushed in or shoved out of place. Brown stated that the defendant believed that his brother, Nicki, had been getting in his truck and doing something to his vehicle. The defendant stated that he went to speak about this with his father, and an argument ensued. The defendant stated that his father had said he was "crazy, crazy, crazy" and wanted the defendant to get on medication because he was just imagining that his brother had been getting in his vehicle.

¶ 21    Brown stated that, when the defendant was asked how times he had pulled the gun out, the defendant initially stated that he had pulled it out two to three times, and then later stated that he had pulled it out just one time. Brown testified that the defendant stated that the gun was loaded, that he had accidentally pointed it towards his father just one time, and then the gun went off. Brown stated that the defendant approximated that the argument with his father lasted two to five minutes. The defendant had further stated that he had pulled the gun out trying to scare his father, that his father had said "No, don't, don't, don't" when he had pointed the gun at him, and that the gun went off soon after that. Brown stated that the defendant estimated that the gun was pointed at his father for just a few seconds.

¶ 22    Brown further testified that the defendant had acknowledged that he had an Illinois concealed carry license[3] and training on firearms. Brown stated that the defendant admitted that his father did not have a weapon and had not made any threats towards the defendant at the time of the incident. Brown stated that the defendant maintained his weapon had not really been pointed at his father, that he was not looking at his father when the gun went off, but that the defendant knew that his father had been hit in the face on the area of his cheek. Brown also stated that the defendant acknowledged that he had cocked the handle back and had his finger on the trigger, but that the defendant stated that he had the gun pointed down during the argument. Brown further testified that the defendant acknowledged that he had shot his father, but throughout the interview, maintained that the shooting was accidental.

¶ 23    Next, Tammy Turner, a crime scene investigator with the ISP on the date of the incident, testified at trial that she photographed and processed the defendant's truck and found two different pistols, including a loaded Ruger Mode GP 100 .357 Magnum revolver (Ruger revolver) with one round missing. Turner stated that there was also a box of .357-caliber ammunition with six rounds missing. Turner testified that she also photographed and processed the Schapmires' residence. Turner stated that she had located a projectile that had entered the east wall of the bedroom at a height of one foot, seven inches, went through several layers of construction, and was found in the outside vinyl siding on the residence.

¶ 24    Angela M. Horn, a certified expert in the field of forensic science, then testified at trial that she worked for the ISP Metro-East Forensic Science Laboratory as a firearm and toolmark identification expert. Horn stated that she had examined the Ruger revolver and determined that

---

[3]Prior to trial, the parties had stipulated that the defendant had a valid Illinois firearm owner identification card and a valid Illinois concealed carry permit.

8

one of the loaded rounds had been fired. Horn further testified that the projectile recovered at the scene of the incident was fired from the Ruger revolver.

¶ 25    Horn went on to testify that the Ruger revolver had a transfer bar safety which prohibits the hammer from hitting the firing pin and causing the weapon to fire when the trigger was at rest. As such, Horn explained that if the gun was cocked, the transfer bar safety would prevent the weapon from firing until the trigger was fully depressed to the rear. Horn testified that there were no other safety features on the Ruger revolver. Horn went on to testify that she had completed a functionality check on the Ruger revolver and it was working properly. Horn stated that she had also tested the Ruger revolver to determine whether it could fire on its own. Horn stated that she had cocked the Ruger revolver and then struck it with a rubber mallet on both sides of the gun and the back of the hammer, and that the hammer never fell. Horn stated that, even if the hammer had fallen, it would not have fired due to the transfer bar safety.

¶ 26    Mark Stram, who worked in the investigation unit of the ISP at the time of the incident, testified at trial that on May 16, 2015, he responded to a call that an individual was shot at the Schapmires' residence. Stram stated that he went to the Schapmires' residence and then left the residence to participate in the interview with the defendant. According to Stram's testimony, the defendant stated during the interview that he was having a disagreement with his father, that he had a gun with him, that he cocked the gun and pointed it at his father, and that the gun went off. Stram's testimony was consistent with Brown's testimony regarding the defendant's statements during the interview. Stram testified that the defendant had stated, at least 10 times during the interview, that the shooting was accidental, and that the defendant had talked about "de-cocking the gun and the gun discharg[ing]."

¶ 27    Stram also testified that he had spoken with Shirley on three separate occasions during the course of the investigation. Stram stated that the first time he spoke with Shirley was the day of the incident when he called her in an attempt to determine what had happened. Stram testified that Shirley had stated that she was in the closet and heard Nick and the defendant talking in the bedroom. Shirley then stated that she had heard a gunshot and came out to discover Nick on the bed bleeding and the defendant standing there stating that it was an accident. Stram stated that the second time he spoke with Shirley was at the hospital and that she had basically provided the same information. Stram testified that the third time he had spoken with Shirley, she attempted to deflect everything away from the defendant and that he got less and less information from her because she got more "standoffish."

¶ 28    Finally, Dr. James Jacobi, a forensic pathologist, testified at trial that he performed the autopsy on Nick on May 18, 2015. Dr. Jacobi stated that Nick received a gunshot wound on May 16, 2015, and died the following day on May 17, 2015. Dr. Jacobi stated that the gunshot wound was below the right eye and that his examination did not find any gunpowder residue or stippling, indicating that the wound was inflicted at least one foot away. Dr. Jacobi opined that Nick's death was not accidental, because there was no good evidence to support an accidental death. Dr. Jacobi recommended that it was a homicide death due to the actions of another individual. That opinion, Dr. Jacobi stated, was not based on witness report or statements, but the probability of homicide was much higher than accidental death.

¶ 29    After the close of evidence, the trial court conducted a conference on jury instructions and the following dialog occurred:

"THE COURT: People's No. 5,[4] charge against the defendant.

[DEFENSE COUNSEL]: And I am objecting to that one.

* * *

THE COURT: That's fine. Yeah. Okay. What is your objection?

[DEFENSE COUNSEL]: Okay. One moment, please. I would request that the Court instead give Defendant's Instruction No. 1.[5] I am asking for an instruction on second degree murder and involuntary manslaughter."

¶ 30     The trial court heard arguments from the parties and then stated, "I'm refusing the Defendant's instruction." The defense counsel then informed the trial court that he was objecting to all the jury instructions from that point based on the trial court's refusal to instruct on the two lesser offenses. After completion of the jury instruction conference, closing arguments were conducted and the trial court instructed the jury. After deliberations, the jury found the defendant guilty of first degree murder (intentionally causing great bodily harm), first degree murder (knowingly created strong probability of great bodily harm), and discharging a firearm that caused death.

¶ 31     On August 21, 2020, the defendant filed a motion for new trial raising the issue, *inter alia*, that the trial court erred in refusing to instruct the jury on the offenses of second degree murder and involuntary manslaughter. On September 16, 2020, the trial court conducted a hearing on the defendant's posttrial motion. At the hearing, the trial court heard arguments and then denied the defendant's motion for new trial in open court. The trial court then proceeded to sentencing. During

---

[4]The State's jury instruction number five was Illinois Pattern Jury Instructions, Criminal, No. 2.01 (4th ed. 2000).

[5]The defendant's jury instruction number one was Illinois Pattern Jury Instructions, Criminal, No. 2.01J (4th ed. 2000).

11

the pronouncement of the sentence, the trial court stated, "So there was a gap of time there from the shooting to the point of actual death. There's no question he suffered." The trial court discussed several other factors and then sentenced the defendant to a total of 50 years' confinement within the Illinois Department of Corrections.

¶ 32    The defendant now appeals his convictions and sentence arguing that the trial court erred in failing to instruct the jury on the lesser-included offense of involuntary manslaughter[6] where the record contained substantial evidence that the defendant did not intend to kill the victim. The defendant also argues that the trial erred in considering the victim's suffering as an aggravating factor at sentencing where there was no evidence to support the finding that the victim had suffered before his death.

¶ 33                                        ANALYSIS

¶ 34    The first issue that the defendant raises on appeal is that the trial court erred in refusing the defendant's request that the jury be instructed on the lesser-included offense of involuntary manslaughter. The defendant argues that the record contained substantial evidence that the defendant did not intentionally kill Nick but had caused his death by carelessly and recklessly mishandling a loaded firearm. The defendant states that he had consistently maintained that he never intended to shoot Nick but admits that he was aware that the gun was loaded and that the loaded firearm was cocked at the time it discharged. The defendant argues that such conduct has been held to constitute reckless behavior and, therefore, he was entitled to have the jury instructed on involuntary manslaughter.

---

[6]The defendant's motion for new trial argued that the trial court erred in refusing to instruct the jury on the offenses of second degree murder and involuntary manslaughter, but on appeal, the defendant limited his argument to involuntary manslaughter.

¶ 35 The State argues that the trial court did not err because the jury could not have rationally found the defendant guilty of involuntary manslaughter. The State notes that the defendant's retelling of the event was never consistent, and that the defendant's assertion that the shooting was accidental was contradicted by a forensic scientist. According to the State's argument, the forensic scientist tested the gun and determined that the hammer could not fall by itself, and that even if the hammer had fallen, the safety feature would have prevented the gun from firing. As such, the State argues that the "hammer slipping," which was the defendant's only asserted reason for an accidental discharge, was factually impossible. Therefore, the State argues that the trial court did not err in refusing to instruct the jury on involuntary manslaughter since the jury could not rationally find the defendant guilty of the lesser offense.

¶ 36 A lesser-included offense is an offense established by proof of lesser facts or a lesser mental state, or both, than the offense charged. *People v. Robinson*, 232 Ill. 2d 98, 105 (2008). A defendant may be convicted of a lesser-included offense that was not included in the charging instrument if the evidence at trial rationally supports that outcome. *People v. Kolton*, 219 Ill. 2d 353, 360 (2006). A defendant is guilty of first degree murder, as charged in this matter, when the defendant kills a person without lawful justification and knows, at the time of his acts, that such acts will cause death or create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2014); Illinois Pattern Jury Instructions, Criminal, No. 7.02 (4th ed. 2000). A defendant commits involuntary manslaughter when that person unintentionally kills an individual without lawful justification when his acts are such to likely cause death or great bodily harm and those acts are performed recklessly. 720 ILCS 5/9-3 (West 2014). A person is reckless or acts recklessly when that individual "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard

13

constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." *Id.* § 4-6.

¶ 37   The difference between involuntary manslaughter and first degree murder lies in the mental state that accompanies the conduct resulting in the victim's death. *Robinson*, 232 Ill. 2d at 105. Involuntary manslaughter requires a less culpable mental state than first degree murder and, as such, is a lesser-included offense of first degree murder. *Id.* "[T]he appropriate standard for determining whether a defendant is entitled to a jury instruction on a lesser-included offense is whether there is *some evidence* in the record that, if believed by the jury, will reduce the crime charged to a lesser offense, not whether there is *some credible* evidence." (Emphases in original.) *People v. McDonald*, 2016 IL 118882, ¶ 25. The trial court should not weigh the evidence when deciding whether a jury instruction is justified since it risks the trial court invading the function of the jury and substituting its own credibility determination for that of the jury. *Id.* We review a trial court's determination that there was insufficient evidence to justify the giving of jury instruction under an abuse of discretion standard. *Id.* ¶ 42. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Patrick*, 233 Ill. 2d 62, 68 (2009).

¶ 38   In this matter, the defendant testified that he was uncocking the gun when it fired and described the manner in which he was uncocking the gun as follows:

"You have to put your thumb on the hammer to uncock it and put your finger on the trigger. Well, my thumb slipped off of the hammer, and then the gun discharged."

¶ 39   The State argues that its forensic scientist rendered the defendant's version of the events factually impossible. The forensic scientist testified that the gun was tested, with the hammer cocked and without having a finger on the trigger, by hitting the gun and the hammer and that the

14

hammer stayed in place and did not fall forward. According to the defendant's testimony, however, he had his finger on the trigger in order to uncock the gun when the hammer went forward. The forensic scientist also testified to the amount of pull required on the trigger to allow the gun to discharge; however, there was no testimony regarding the amount of pull required, if any, to be placed on the trigger in order to uncock the gun or whether a finger placement on the trigger was even necessary to uncock the gun.

¶ 40    Regardless, the issue here is whether there was some evidence presented at trial, whether through express testimony or through inference from the testimony, that would have permitted the jury to rationally find the defendant guilty of involuntary manslaughter. While the defendant may not have been consistent in his testimony compared to his statements to law enforcement, he was consistent throughout the investigation and trial that the shooting was not intentional. It was the province of the jury to weigh the credibility of the testimony at trial, including that of the forensic scientist and the defendant. We find that it is entirely possible that, if the jury chose to believe the defendant and/or questioned the findings of the forensic scientist in some manner, they may have found the defendant guilty of involuntary manslaughter and not first degree murder. Under the instructions given, however, the jury had no alternative other than to find the defendant guilty, or not guilty, of first degree murder.

¶ 41    The defendant was entitled to have submitted to the jury any defense which his testimony, or any other evidence, tended to prove. "When the evidence raises the basis for the instruction, a trial court's refusal results in a denial of defendant's due process and entitles a defendant to a new trial." *People v. Hari*, 218 Ill. 2d 275, 297 (2006). In this matter, we find that the record contains some evidence that, if believed by the jury, would tend to prove the lesser rather than the greater crime. Therefore, we find that the trial court's refusal to give the instruction defining the crime of

involuntary manslaughter, and an instruction as to the form of the verdict for that offense, to be unreasonable and an abuse of discretion. The double jeopardy clause does not preclude retrial of a defendant whose conviction is set aside because of an error in the proceedings, such as incorrect receipt or rejection of evidence, prosecutorial misconduct, or as in this case, incorrect instructions. *People v. Mink*, 141 Ill. 2d 163, 173 (1990). As such, we reverse the defendant's convictions and sentence, and remand for a new trial.

¶ 42    The defendant also presents a second issue on appeal concerning his sentence. Because we have determined that a new trial is warranted, the defendant's sentencing issue has been rendered moot.

¶ 43                                    CONCLUSION

¶ 44    For the foregoing reasons, we reverse the defendant's convictions and sentence, and remand for a new trial.


¶ 45    Reversed and remanded.