164 Cal.App.4th 269 (2008)
THE PEOPLE, Plaintiff and Respondent,
v.
RICKY JAY HOLLOWAY, Defendant and Appellant.
No. F053408.
Court of Appeals of California, Fifth District.
June 26, 2008.
*272 Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and John A. Bachman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
KANE, J.
Defendant Ricky Jay Holloway caused two separate accidents when he drove into oncoming traffic, leaving one driver with serious and extensive injuries. Defendant appeared intoxicated and blood tests revealed he had three prescription medications in his system. He was convicted of driving under the influence and causing bodily injury, driving with a suspended license, driving under the influence, and hit-and-run driving. On appeal, he raises numerous contentions, but we address only one. We find merit in his contention that the trial court erred by failing to instruct on the defense of involuntary intoxication due to prescription medication. We will reverse and remand.

PROCEDURAL SUMMARY
Defendant was charged in two separate pleadings, one for each accident, and the two cases were consolidated for trial. In the first pleading, defendant was charged with driving under the influence and causing bodily injury (Veh. Code, § 23153, subd. (a); count I) and misdemeanor driving with a suspended license (Veh. Code, § 14601.1, subd. (a); count II). The information further alleged, as to count I, that defendant personally inflicted great bodily injury (Pen. Code, § 12022.7) and injured a second victim (Veh. Code, § 23558). As to count II, the information further alleged defendant had suffered two prior convictions for driving with a suspended license in 2005 and 2006 (Veh. Code, § 14601.1).
A second complaint charged defendant with misdemeanor driving under the influence (Veh. Code, § 23152, subd. (a); count I), misdemeanor driving with a suspended license (Veh. Code, § 14601.1, subd. (a); count II), and misdemeanor hit-and-run driving (Veh. Code, § 20002, subd. (a); count III). As to count II, the complaint further alleged defendant had suffered two prior convictions for driving with a suspended license in 2005 and 2006 (Veh. Code, § 14601.1).
*273 Defendant admitted the prior conviction allegations. The jury convicted him of all charges and found true the remaining allegations. The trial court sentenced defendant to six years in prison, as follows: the midterm of two years for driving under the influence and causing bodily injury, plus a three-year enhancement for personal infliction of great bodily injury and a one-year enhancement for injury to a second victim. The court imposed concurrent one-year terms on the misdemeanor counts.

FACTS
About 7:50 a.m. Sunday morning, August 20, 2006, Louis Dias was on his way to Orchard Supply in Sonora. He was driving a full-size, half-ton pickup truck on Greenley Road, going about 20 or 25 miles per hour. As he was following the curve of the road, he noticed a white Ford Expedition headed in his direction. The Expedition was speeding and crossing into his lane, coming right toward him. He knew the Expedition was going too fast to stay in its lane. It was leaning and he thought it might roll. The driver did not even try to control or turn the Expedition. There was no way Dias could get out of the way and he knew the Expedition would hit him head-on, so he quickly looked in his rearview mirror, turned his wheel hard and threw his body to the right. The Expedition hit the truck's front left panel, smashing the driver's door and separating the truck from the rear part of the chassis. Dias, who was wearing his seatbelt, was not injured, but his truck was totaled.
Dias sat in his truck, not believing what had just happened. He thought the Expedition must have stopped because it had hit him so hard, but he looked around and saw no one. He heard a noise fading away and he assumed the Expedition had driven on. When Dias got out of his truck, he saw a gouge in the asphalt that went up over the hill. He realized that despite being badly damaged and dragging something, the Expedition had not slowed down at all.
Brandon Babbitt was traveling in a car about 300 feet behind Dias's truck. He saw the Expedition going much faster than the posted 25-mile-per-hour speed limit. He estimated its speed at about 60 miles per hour. He saw the Expedition swerving into the opposing lane and he thought it would hit the truck. When it did, he heard screeching and debris coming off the truck. After the collision, the Expedition slowed down slightly but continued toward Babbitt. It was still going about 60 miles per hour. Babbitt was able to turn off the road to get out of its way. As the Expedition passed by him on the wrong side of the road, he heard a scraping sound. He went to make sure Dias was okay.
Jennifer Lavender, a certified nursing assistant, was about to unlock her car in the hospital parking lot adjacent to Greenley Road. She saw the Expedition, which she thought was going about 60 or 70 miles per hour, run into the *274 truck. She thought it would stop then, but it continued at the same or greater speed; it did not seem to slow at all. It was fishtailing all over the road, making a loud scraping noise and throwing sparks as it headed over the hill. Then she heard a huge explosion. She went to the truck to check on Dias.
Shane Tipton worked as a physician's assistant at the hospital. He was sitting in his office, looking out on Greenley Road. He was dictating reports when he heard a loud scraping sound that resembled the sound of a snow blower scraping the road. He stood up and saw the Expedition coming up the road dragging the left end of its front bumper. He thought it was going about 30 or 35 miles per hour, although it was difficult to estimate. The driver seemed to have trouble controlling the front end. The Expedition crossed completely into the opposing lane and ran directly into a purple PT Cruiser. The driver of the Expedition seemed to make no attempt to stop or slow down, other than a last-minute swerve to avoid the collision. The impact happened very quickly. The Expedition's rear end came off the ground and the PT Cruiser was turned horizontally against a fence.
Tipton called 911 and went to the crash site, which was about one-quarter of a mile away. Another man was already on the scene and he told Tipton that the driver of the Expedition seemed okay but the driver of the PT Cruiser was in bad condition. Tipton looked into the Expedition and saw defendant moving around and trying to get out the passenger door because the driver's side was damaged. Tipton told defendant to stay where he was, but he was determined to get out of the vehicle. Defendant seemed to be in a fog or "a bit of in a stupor for the situation." Defendant did not ask Tipton whether anyone was hurt or what was going on. Defendant got out with his cane and propped himself against the back seat. The other man at the scene helped defendant to the curb, where he sat for a few minutes. Then he got up, opened the Expedition's hatch and started unloading his bagged groceries onto the ground. His milk was spilling and he was trying to salvage his groceries. In Tipton's opinion, defendant's behavior seemed inappropriate and very unusual under the circumstances.
Darrin Ray, the driver of the PT Cruiser, was badly injured and a little girl in the backseat was screaming. Tipton could not help Ray because he was pinned in the car. Ray's daughter suffered some abrasions on the sides of her neck that were probably caused by the seatbelt harness. Ray's femur, tibia and talus were broken, his lung punctured and his pelvis shattered.[1]
*275 California Highway Patrol Officer Pittman responded to the first crash scene about 8:00 a.m. Dias's truck was blocking the lane. It was disabled to the extent that it could not even be pushed out of the road.
Fifteen or 20 minutes later, Pittman approached the second accident about one-quarter mile from the first accident. Pittman noticed a gouge in the asphalt between the two accidents. It appeared that the Expedition had been damaged in the first accident and had dragged something in the road. In Pittman's opinion, a typical driver would have noticed he was dragging something in the road that was loud enough to be heard across the street. He believed that dragging such an object could have made the vehicle difficult to control. Pittman saw the Expedition facing north in the southbound lane. The purple PT Cruiser was off the road, facing west. The vehicles had been in a head-on collision and both had sustained extensive damage. Pittman believed the collision had occurred at a fairly high speed. The driver's side of the PT Cruiser was crushed and emergency personnel were trying to extricate Ray from his vehicle with hydraulic jaws. His daughter had already been taken from the scene. It took about 45 minutes to remove Ray. He was transported by air to the hospital, where he underwent emergency surgery.
Meanwhile, defendant was milling about around the Expedition. Pittman observed he was wearing pants, a shirt and a baseball cap. He had a slipper on one foot and a sock on the other. He looked disheveled and not dressed to be out and about. At this point, about 25 minutes had transpired since the accident. Pittman approached defendant and determined he had no apparent injuries. Pittman, who was specially trained in the recognition of the signs and symptoms of drug use, immediately noticed defendant was having great difficulty functioning and standing, even with his cane, so Pittman asked him to sit down on the curb. Pittman asked defendant if he was the driver of the Expedition and told him he needed his registration and insurance information. Defendant provided his identification card. He seemed confused and unsure about the collision. Defendant said he did not know about the collision. Pittman was uncertain whether defendant was aware it had occurred.
Defendant eventually told Pittman he had been driving 25 miles per hour when the other car came into his lane, causing him to swerve to avoid it. Pittman pointed out that the Expedition was in the opposing lane of traffic. Defendant was evasive and avoided answering Pittman's questions. He did say he was driving home from the store and he knew nothing about the first accident.
Pittman observed that defendant's speech was extremely slurred and his eyes were very droopy. He had horizontal gaze nystagmus and his pupils were constricted and nonreactive to light. His hands were very shaky and he *276 refused to perform the finger-to-nose test. Pittman suspected defendant was driving while impaired, although there was no sign he had consumed alcohol. Pittman asked defendant whether he had taken any prescription drugs. Defendant was evasive, then said he had a bone disease. Pittman asked him if he took medication for it. Defendant looked down and did not answer, even though Pittman asked several times. Defendant finally said he was taking some blood pressure medication. He did not mention any other medication. After Pittman determined defendant had objective symptoms of drug intoxication, he arrested him.
Defendant was adamant that he was not going to the hospital. Pittman tried to convince him to ride to the hospital in an ambulance, but he refused. He remained obstinate so Pittman put him in his car and took him to the hospital.
At the hospital, Pittman continued his testing of defendant. Pittman did not ask defendant to perform the psychophysical tests that included standing and walking because he was unsteady and Pittman believed he might fall down and injure himself. Defendant was very obstinate and did not want to cooperate with Pittman. Defendant's pupils were constricted and did not react to changes in light. His eyes also exhibited a lack of convergence, an inability to track a stimulus onto the bridge of his nose. He continued to exhibit horizontal gaze nystagmus.
According to Pittman, a lack of convergence is a symptom of depressant drugs, inhalant drugs, PCP and cannabis. Pupil constriction is very common in someone taking a narcotic analgesic, such as Vicodin. Droopy eyelids are a symptom of depressant drugs and narcotic analgesics. Overall, defendant's symptoms led Pittman to conclude defendant was under the influence of a narcotic analgesic and it was unsafe for him to drive a vehicle.
Defendant's blood, drawn at the hospital, was found to contain three prescription drugs: Soma (carisoprodol),[2] Klonopin (clonazepam), and Vicodin (hydrocodone). According to Ronald Kitagawa, a forensic toxicologist, all three drugs are central nervous system (CNS) depressants, although each has a distinct purpose.
Soma is often used as a muscle relaxant for those suffering from lower back pain. The most common side effects of Soma are sedation and loss of coordination. Others included dizziness, disorientation, weakness, and visual disturbances such as horizontal gaze nystagmus. These effects would influence a person's ability to process information while driving and also his ability to track, resulting in drifting and weaving. Klonopin is an antiseizure *277 medication. Because it is a benzodiazepine, it depresses the CNS. It has similar side effects to Soma and it would have a similar effect on a person's ability to drive. When a person starts taking Soma and Klonopin, the side effects might be more pronounced.
Vicodin is a narcotic analgesic used to treat moderate to severe pain. Although it is also a CNS depressant, at therapeutic doses it does not usually cause the same side effects as Soma and Klonopin. A normal dose of Vicodin would not cause many adverse effects. When taken with other CNS depressants, however, its use could have an additive effect. For example, when taken with alcohol, it could cause sedation and poor coordination.
In general, these medications could have an additive effect if taken together. A tolerance to all three drugs would occur over time.
Kitagawa opined that defendant's unreactive pupils might have been caused by Vicodin. Nonconvergence is a symptom of either Soma or Klonopin, although it is not a common one. Defendant's inability to perform the balance, walk-and-turn, and one-leg-stand tests could have been a result of loss of coordination due to Soma and/or Klonopin. His slurred speech could have been caused by any of the drugs, but in particular Klonopin, although defendant would have built up a tolerance to Klonopin.
In light of the drug levels in defendant's blood and his symptoms described in the police report, Kitagawa believed defendant was under the influence of one, two or all three of these drugs. If defendant was weaving as he drove, the drugs were affecting his driving and he was driving impaired.
On cross-examination, Kitagawa agreed that he could not conclude based on the toxicology report alone whether defendant was impaired to drive a vehicle. Kitagawa's opinion was based on both the toxicology report and Pittman's observations.

Defense Evidence
Defendant and his wife, Donna, had been married for 12 years. They lived in an apartment on Greenley Road in Sonora with their teenaged son. Defendant had suffered from degenerative disc disease for their entire marriage and had been walking with a cane for about four years. He also had emphysema and chronic bronchitis. He used a motorized scooter to go to the store and to get around. He had not driven a car since the summer of 2005 because his license had been revoked. He and Donna owned two cars  a Ford Expedition and a Toyota Celica  but only Donna drove them.
*278 Early in the summer of 2006, Donna's father came to live with them because he was terminally ill and needed care, which defendant and Donna provided. About two or three weeks before the accidents, Donna's father fell and broke his hip. He was in the hospital for several days, then returned to defendant and Donna's apartment. From that point, he worsened quickly and required 24-hour care. He stayed in a hospital bed in the living room and defendant and Donna began taking night and day shifts to care for him. Their schedules and their lives changed. Donna would go to bed at 9:00 p.m. and defendant would care for Donna's father from 9:00 p.m. to 7:00 or 8:00 a.m. Then he would go to bed and Donna would take over. During these two or three weeks, defendant's behavior changed. He was not sleeping well and he was tired. He was acting strangely and he did not always seem to know what he was doing.
Sometimes Donna and defendant would be conversing and suddenly defendant would just stare at Donna. It was as though Donna was suddenly talking to herself and defendant was blacked out. Defendant seemed not to understand what she was saying. He did not even acknowledge that she was speaking to him. During these episodes, he would have a blank look of confusion on his face, but he was awake and able to move around. These episodes could last an hour. Sometimes, defendant would go into the bedroom to lie down.
On one occasion, Donna was talking to defendant when he just turned around and walked down the hall. Then he fell and hit his head on the wall, leaving a hole in the wall. When he woke up, he asked what had happened to the wall. Donna told him and he denied it. He believed their son had kicked the wall.
On another occasion, Donna and her friend were inside the apartment when they heard a crash. Donna jumped up and ran outside. Defendant had tipped his motorized scooter and was lying under it. Donna lifted the scooter off of him and took him back in the house.
These episodes occurred frequently during the two or three weeks after the schedule change. Defendant had experienced a few episodes before the schedule change, but they became more frequent afterward. When Donna discussed the episodes with defendant, he had no memory of what had happened.
Defendant's sister, Kathy, who lived in Valley Springs, tried to visit defendant every other week. She knew he and Donna were not feeling well. They were both very tired and they were not eating or sleeping properly.
*279 Defendant was very stressed about Donna's father's illness. Kathy had noticed defendant had not been himself. He had become forgetful and was misplacing things.
On August 19, 2006, the day before the accidents, Kathy decided to bring them some homemade soup. Kathy arrived at their apartment around noon. She knocked, but no one answered the door. She went in and saw Donna sleeping in the chair next to the couch, where Donna's father sat in hospital clothes. Defendant was in the bedroom, sleeping in a chair next to the bed. She woke defendant up and offered to take him to the store because neither he nor Donna were driving. He agreed and began getting some money together. He gathered about $40 in cash and about $20 on some type of debit card. When he and Kathy arrived at the grocery store, defendant got a cart. He spoke to some people he knew and placed his groceries in the cart. He was moving more slowly than Kathy wished because he was looking for sales and trying to determine how much he could afford. He picked out some bacon, two gallons of milk, two loaves of bread, ice cream, lunch meat and other items. He seemed fine as he was shopping. When he was finished, they got into the checkout line. Kathy unloaded the cart while defendant chatted with some people behind him in line. The groceries amounted to about $60, so they knew they had enough money. Defendant gave the cashier $40 and told her he had $20 on the card. He swiped the card, but could not remember the four-digit personal identification number (PIN). The cashier told him he needed to remember it because he would only get three attempts. He tried to reenter the PIN and got it wrong again. Kathy was getting impatient with him and told him to hurry because they were holding up the line. Defendant tried to tell Kathy the PIN, but he could not. He became confused and went blank. A lady behind them said he looked pale. He was saying things, but Kathy could not hear them. Then his head went back and his eyes rolled back in his head; he was about to fall. He seemed to be asleep. Kathy asked for help and two men from the line helped her move defendant to a chair. Kathy and the cashier sorted through the groceries and Kathy tried to pick out the items she knew defendant and Donna needed the most. Kathy chose, among other things, the two gallons of milk, the two loaves of bread and the lunch meat, and paid for them with the $40. She and the men took defendant to the car. Some of the people from the line paid for the rest of their groceries and brought them out.
Kathy put defendant's seatbelt on him. She did not know what had happened to him. She was upset with him for embarrassing her. He asked her, "`What did I do?'" He was still "out of it," and he sat holding his head as though he had a headache. When they got home, Kathy ran into the house and told Donna what had happened. Kathy and Donna helped defendant into the house and brought in the groceries. Defendant walked toward the bedroom. Kathy hurriedly left for work.
*280 The next morning at 6:30 a.m., defendant called Kathy. He asked her if they had gone to the store the day before. She answered, "`Yeah, we went to the store.'" She asked him, "`Don't you remember embarrassing me?'" He said, "`No.'" That was the entire conversation.
About an hour later, at 7:30 a.m., Donna got up and found defendant making breakfast in the kitchen. He was cooking bacon. He had been up all night. Donna's father was in the hospital bed in the living room. Donna said "good morning," then went to the bathroom to get ready. When she returned about five minutes later, defendant was gone. The bacon was still cooking in the pan. Donna asked her father where defendant had gone and he said defendant had gone outside. Donna went outside to look for him and she was very surprised to discover that the Expedition was gone. Later that day, defendant called her from jail.
The next day, Donna went to look at the wrecked Expedition at the tow yard. Inside, she found bread and milk. They already had bread and milk at home from the trip Kathy and defendant had made to the store the day before the accidents.
At trial, Donna identified the empty bottles of some of the prescription medications defendant had been taking. As far as Donna knew, defendant took his medications as directed. When defendant's schedule changed, he changed his medication schedule too. He still took his sleeping medications at bedtime, but his bedtime had shifted to the morning.
On cross-examination, Donna testified that each of the bottles she was observing bore warnings. The Soma bottle stated, "`May cause drowsiness; avoid alcohol; do not drive if drowsy.'" The temazepam bottle stated, "`Do not stop without doctor's advice; avoid alcohol; do not drive if drowsy.'" The MS Contin bottle stated, "`[A]void alcohol; do not drive if drowsy.'" The hydrocodone bottle stated, "`[M]ay cause drowsiness.'" Donna had not noticed defendant becoming drowsy when he took hydrocodone because he had been taking it for a while and was used to it.
Donna believed defendant had been taking these four medications for five or six years.[3] Since the accidents, he had quit taking temazepam and he had not suffered any more episodes.
Jeffery Zehnder, a forensic toxicologist, testified that his lab and another lab tested defendant's blood for Soma, Klonopin, temazepam and hydrocodone. Soma was present in defendant's blood at 2.6 milligrams per liter, *281 which was within the typical therapeutic range (10-40 milligrams per liter). Klonopin was present at 0.06 milligrams per liter, at the middle of the therapeutic range (0.005-0.120 milligrams per liter). Temazepam was present at less than 10 nanograms per milliliter, far below the therapeutic range (400-900 nanograms per milliliter). Hydrocodone was present at 29 nanograms per milliliter, just below the therapeutic range (30-250 nanograms per milliliter).
The typical therapeutic levels do not necessarily represent the appropriate therapeutic level for any given person. Furthermore, blood levels cannot predict the effects a drug would have on a person. A person's exhibited symptoms must be observed. All four medications are CNS depressant drugs, so any one of them alone or in combination could cause CNS impairment, even if they were within a therapeutic range. CNS impairment could slow processing of information and reaction time. At lower doses, it results in relaxation; at higher doses, it can cause intoxication. Taken together, these four medications could have an additive effect. A hypothetical driver with symptoms similar to defendant's who is unable to control his vehicle and is driving on the wrong side of the road could be suffering from the effects of such drugs.
When a person starts taking Soma, it can cause intoxication and impairment even at subtherapeutic amounts. However, a person can develop a tolerance to it, so for someone who has taken it for years, higher levels are needed to manifest the same effect. Hydrocodone's effects also depend on a person's tolerance to the drug. A person could have a tolerance to all of these drugs.
Gregory Sokolov, a psychiatrist, performed a workup on defendant. He spoke to various people and examined medical and jail records. Defendant informed Sokolov that he took his medications on a schedule. He changed his bedtime medications to the time he went to bed, but he was not getting much sleep. Sokolov concluded that at the time of the accidents, defendant was in a "sedative, hypnotic, anxiolytic state," a type of drug-induced intoxication.[4] This state could render him unable to operate a motor vehicle safely. Sokolov attributed defendant's episodes, which he determined began in the summer of 2006, to the direct effects of the medications he was taking. The effects were not necessarily normal, but they were a potential risk or side effect for anyone taking the medications. In defendant's case, the effects were related to his change in sleep cycle. This type of change can make a person prone to confusion, and a drug such as Klonopin can increase the risk of blackouts.
*282 In Sokolov's opinion, defendant was not conscious of his actions during the blackouts described by Donna and during the 10-minute episode at the grocery store with Kathy. Furthermore, he believed defendant was not conscious of the fact that he was driving on the day of the accidents. Sokolov believed Klonopin was the source of defendant's intoxication. He thought defendant had ingested the medication eight to 12 hours before his blood was drawn. Sokolov's opinion was that defendant was actually in a blackout state or that he was "sleep driving," despite his ability to speak and describe events. It is possible for a person in such a state to perform acts like driving because those acts are deeply ingrained rote memories. On the other hand, recently formed memories are impaired, causing the unconsciousness of those acts. When people come out of a period of unconsciousness, they can be quite disturbed, not believing where they are or what has happened. Some become violent and agitated. Some are embarrassed and make up stories to explain what has happened. Others are tearful and depressed. It is possible, as in defendant's case, that some people become uncooperative and obstinate.
Sokolov noted that defendant's prescription bottles bore warnings about operating machinery and driving while drowsy, but not about blackouts or acting while unconscious. Sokolov did not know whether anyone had warned defendant that his medications, in combination with a change in his sleep cycle, might cause him to become unconscious of his actions.

DISCUSSION
Defendant contends the trial court erred by refusing to instruct on the defense of involuntary intoxication due to prescription medication. He argues the trial court improperly relied on People v. Chaffey (1994) 25 Cal.App.4th 852 [30 Cal.Rptr.2d 757] to conclude as a matter of law that he was voluntarily intoxicated. We agree with defendant.
Unconsciousness is a complete defense to a criminal charge. (Pen. Code, § 26, class Four;[5]People v. Halvorsen (2007) 42 Cal.4th 379, 417 [64 Cal.Rptr.3d 721, 165 P.3d 512].) "To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist `where the subject physically acts but is not, at the time, conscious of acting.' [Citation.] If the defense presents substantial evidence of unconsciousness, the trial court errs in refusing to instruct on its effect as a complete defense. [Citations.]" (Ibid.) "`"Substantial evidence" in this specific context is defined as evidence which is "sufficient to `deserve consideration by the jury, i.e., "evidence from which a jury composed of *283 reasonable men could have concluded"' that the particular facts underlying the instruction did exist." [Citations.]' [Citation.]" (People v. Lemus (1988) 203 Cal.App.3d 470, 477 [249 Cal.Rptr. 897].)
(1) Section 22 of the Penal Code codified the common law, excluding from this defense persons who become unconscious due to voluntary intoxication.[6] Thus, a person who voluntarily consumes alcohol or an illegal drug is held responsible for his ensuing criminal acts even if he was unconscious when he committed them. (People v. Morrow (1969) 268 Cal.App.2d 939, 949 [74 Cal.Rptr. 551] [when person takes his first alcoholic drink by choice and afterwards drinks successively and finally gets drunk, that is voluntary intoxication, even if he is an alcoholic].) Moreover, when a person voluntarily ingests an illegal drug without knowledge that it also contains another illegal drug, he is voluntarily intoxicated and cannot rely on an unconsciousness defense. (People v. Velez (1985) 175 Cal.App.3d 785, 795-796 [221 Cal.Rptr. 631] [defendant knowingly ingested unlawful drug (marijuana) not realizing it contained another illegal drug (PCP); defendant could not reasonably assume marijuana cigarette would not contain PCP]; People v. Gallego (1990) 52 Cal.3d 115, 183 [276 Cal.Rptr. 679, 802 P.2d 169] [PCP secretly given to defendant while he was taking other illegal drugs], citing People v. Velez, supra, at pp. 795-797.)
Behind these long-established principles is the policy that a person should be responsible for the results of indulging in his own vices: "The preclusion of voluntary intoxication as an absolute defense at common law has been justified on the theory that `"when a crime is committed by a party while in a fit of intoxication, the law will not allow him to avail himself of the excuse of his own gross vice and misconduct to shelter himself from the legal consequences of such crime."' [Citations.]" (People v. Velez, supra, 175 Cal.App.3d at p. 794.) As the Supreme Court stated long ago in People v. Blake (1884) 65 Cal. 275, at page 277 [4 P. 1]: "It has been so frequently and so generally held both in England and in the highest courts of this and other States of the Union, that drunkenness voluntarily brought on is no excuse for crime, that it may be considered as settled law. The propriety of such a law is well vindicated by Denio, J., in People v. Rogers, 18 N.Y. 9 [72 Am.Dec. 484]: `It *284 will, moreover, occur to every mind that such a principle is absolutely necessary to the protection of life. In the forum of conscience, there is no doubt considerable difference between a murder deliberately planned and executed by a person of unclouded intellect, and the reckless taking of life by one infuriated by intoxication; but human laws are based upon considerations of policy, and look rather to the maintenance of personal security and social order, than to an accurate discrimination as to the moral qualities of individual conduct. But there is, in truth, no injustice in holding a person responsible for his acts committed in a state of voluntary intoxication. It is a duty which every one owes to his fellow-men, and to society, to say nothing of more solemn obligations, to preserve, so far as lies in his power, the inestimable gift of reason. If it is perverted or destroyed by fixed disease, though brought on by his own vices, the law holds him not accountable. But if, by a voluntary act, he temporarily casts off the restraints of reason and conscience, no wrong is done him if he is considered answerable for any injury which, in that state, he may do to others or to society.'"
(2) "Clearly, then, one who becomes voluntarily intoxicated to the point of unconsciousness can have no actual intent to commit a crime; rather, criminal responsibility is justified on the theory that having chosen to breach one's duty to others of acting with reason and conscience, one may not entirely avoid criminal harm caused by one's breach of duty. It is therefore apparent the imposition of criminal responsibility for acts committed while voluntarily intoxicated is predicated on a theory of criminal negligence. [Citation.] In California, whether one is criminally negligent is ascertained by applying an objective test: whether a reasonable person in defendant's circumstances has engaged in criminally negligent behavior. [Citation.]" (People v. Velez, supra, 175 Cal.App.3d at pp. 794-795.)
(3) Involuntary intoxication is a significantly different matter. A person who becomes intoxicated involuntarily and commits criminal acts unconsciously is not held responsible for those acts  that is, unconsciousness due to involuntary intoxication is a complete defense. (See Pen. Code, § 26; People v. Velez, supra, 175 Cal.App.3d at pp. 793-797.) "The practice of relieving one of criminal responsibility for offenses committed while in a state of involuntary intoxication extends back to the earliest days of the common law. Involuntary intoxication, it appears, was first recognized as that caused by the unskillfulness of a physician or by the contrivance of one's enemies." (Annot., When Intoxication Deemed Involuntary so as to Constitute a Defense to Criminal Charge (1976) 73 A.L.R.3d 195, 199-200, § 2, fns. omitted.) The defense may have originated as an analogue to the traditional insanity defense, although they are distinct defenses. (In re Devon T. (1991) 85 Md.App. 674 [584 A.2d 1287, 1294].)
*285 A fundamental criterion underlying the unconsciousness defense is the defendant's lack of fault. (See People v. Velez, supra, 175 Cal.App.3d at p. 796.) "Today, where the intoxication is induced through the fault of another and without any fault on the part of the accused, it is generally treated as involuntary. Intoxication caused by the force, duress, fraud, or contrivance of another, for whatever purpose, without any fault on the part of the accused, is uniformly recognized as involuntary intoxication." (Annot., When Intoxication Deemed Involuntary So as to Constitute a Defense to Criminal Charge, supra, 73 A.L.R.3d 195, 200, § 2, fns. omitted.) "A person whose intoxication is not voluntary is relieved from liability because of excusable mistake. `What prevents the intoxication from being voluntary in these cases of fraud is not the trickery of the other person but the innocent mistake of fact by the one made drunk, and an actual ignorance of the intoxicating character of the liquor or drug has the same effect whether the mistake is induced by the artifice of another or not . . . .' [Citation.] . . . `[N]o sufficient reason can be given for punishing those who have become drunk through unavoidable accident, or through an honest mistake . . . .' [Citation.]" (People v. Chaffey, supra, 25 Cal.App.4th at p. 856.)
(4) Situations that clearly qualify as involuntary intoxication include the unknowing ingestion of an intoxicating substance, usually due to trickery or mistake, such as unknowingly drinking a "spiked" punch or consuming a medication believing it to be candy. (E.g., People v. Scott (1983) 146 Cal.App.3d 823 [194 Cal.Rptr. 633] [involuntary intoxication conceded where defendant drank punch he did not know was spiked with PCP, then tried to commandeer a truck and a motorcycle believing he was a CIA agent trying to save the President's life].)
The less defined situations  applicable to the present case  involve the knowing ingestion of prescription medications. (People v. Baker (1954) 42 Cal.2d 550, 575 [268 P.2d 705] [intoxication produced by knowingly taking prescription medication could be considered either voluntary or involuntary intoxication]; People v. Chaffey, supra, 25 Cal.App.4th at p. 856 [intoxication caused by knowingly ingesting prescription medication was either voluntary or involuntary intoxication, depending on whether defendant had reason to know she would become intoxicated]; People v. Hari (2006) 218 Ill.2d 275 [300 Ill.Dec. 91, 843 N.E.2d 349, 359-360] [the unexpected and unwarned adverse effect of a drug taken on doctor's orders is involuntary; it is not a conscious effect of defendant's will, is not resulting from defendant's free and unrestrained choice, and is not subject to control of defendant's will]; see also People v. Garcia (Colo. 2005) 113 P.3d 775, 780; People v. Jackson (2006) 362 Ill.App.3d 1196 [299 Ill.Dec. 366, 841 N.E.2d 1098, 1103]; Sluyter v. State (Fla.Dist.Ct.App. 2006) 941 So.2d 1178, 1180-1181; Commonwealth v. Darch (2002) 54 Mass.App.Ct. 713 [767 N.E.2d 1096, 1098-1099]; State v. Gardner (Wis.Ct.App. 1999) 230 Wis.2d 32 [601 N.W.2d *286 670, 674-675]; Brancaccio v. State (Fla.Dist.Ct.App. 1997) 698 So.2d 597, 599; Commonwealth v. Wallace (1982) 14 Mass.App.Ct. 358 [439 N.E.2d 848, 850]; Sallahdin v. Gibson (10th Cir. 2002) 275 F.3d 1211, 1236.)
The pivotal question, at least in California, is whether the defendant knew or had reason to anticipate that his use of the prescription medication could cause intoxicating effects. (See People v. Chaffey, supra, 25 Cal.App.4th at p. 856.) In the present case, the trial court recognized this question as key. In fact, the court fashioned an instruction, but did not give it because the court determined as a matter of law that defendant knew or should have known his medications could intoxicate him because the warnings on the prescription bottles stated he could become drowsy, should not drink alcohol and should not drive if drowsy. Defendant conceded he knew the medications could cause drowsiness and could impair his ability to drive. Accordingly, the court concluded that defendant was voluntarily intoxicated and that the evidence did not support the giving of instructions on involuntary intoxication caused by prescription medication.
In our view, defendant's concession that he knew the medications could make him drowsy and could impair his ability to drive did not establish that he knew or had reason to know he would suddenly become unaware of his actions and lose his ability to make rational decisions, such as whether to drive.[7]
The factual questions of what defendant knew and what he had reason to anticipate under the circumstances were questions for the jury. It was for the jury to determine whether defendant's knowledge that drowsiness could occur was enough to conclude he had reason to anticipate the more extreme adverse effects he suffered. This consideration includes whether he knew or had reason to know that his recently altered sleep schedule and lack of sleep, in combination with his prescription medications, could result in intoxicating effects.[8]
*287 (5) We do not read Chaffey as holding that when a defendant knows or has reason to know that a prescription medication could make her drowsy, she also knows or has reason to know that something (like unconsciously driving a car) could happen once she becomes drowsy but before she falls asleep. The trier of fact in Chaffey (the court) determined that the defendant did have reason to know this, and the appellate court affirmed the conviction, concluding there was substantial evidence from which the trier of fact could conclude the defendant's intoxication was voluntary. (People v. Chaffey, supra, 25 Cal.App.4th at pp. 854, 857.) But the facts were distinguishable from those in the present case; in particular, the defendant in Chaffey took an overdose of 120 Xanax pills, with knowledge of what they were, in an attempt to commit suicide. This extreme behavior might have led the trier of fact to conclude the defendant had reason to know she might engage in unexpected and dangerous conduct (such as driving) after she ingested the 120 pills but before they had their intended result. In any event, it was a question for the trier of fact. As the Chaffey court twice noted, the trier of fact could have found that the defendant was involuntarily intoxicated, but it did not. (Id. at pp. 857-858.)
(6) Here, defendant was expressly relying on the defense of involuntary intoxication and he presented sufficient evidence to justify instruction on that defense. The failure to so instruct eliminated defendant's only defense from the jury's consideration and cannot be deemed harmless. Accordingly, we reverse and remand for a new trial.[9]
On retrial, CALCRIM No. 3427 should be modified to provide that a person can be involuntarily intoxicated if he or she knowingly ingested a prescription medication but did not know or have reason to anticipate its intoxicating effects.

*288 DISPOSITION
The judgment is reversed and the matter is remanded for a new trial.
Cornell, Acting P. J., and Gomes, J., concurred.
NOTES
[1] Ray spent 22 days in the hospital and underwent three surgeries. When he was discharged from the hospital, he spent two and one-half weeks in transitional care. After that, he went home but was still bound to a wheelchair. He eventually walked with the assistance of a walker and then a cane.
[2] Soma's metabolic byproduct meprobamate was also present.
[3] But she also testified she thought defendant had been taking temazepam for about six months.
[4] "Anxiolytic" means reducing anxiety.
[5] Penal Code section 26, class Four provides that "[p]ersons who committed the act charged without being conscious thereof" are not criminally responsible for that act.
[6] Penal Code section 22 provides: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. [¶] (b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought. [¶] (c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."
[7] Some courts have stated the question instead as whether the defendant's prescription medication caused "unexpected and unwarned adverse effect" (People v. Hari, supra, 843 N.E.2d at pp. 359-360) or "severe unanticipated effects" (Commonwealth v. Wallace, supra, 439 N.E.2d at p. 850). In the present case, the court concluded that because defendant knew he could become drowsy, he knew or should have known he could become intoxicated. As defense counsel noted, it is a matter of semantics, and perhaps an important one.
[8] We also note that some courts differentiate between cases in which the defendant takes the prescription medication as prescribed and cases in which he voluntarily takes an excessive dose of the prescription medication. We believe the factual consideration of whether the defendant's taking of an excessive dose affected what he knew or had reason to know is inherent in the general factual question. (See, e.g., People v. Baker, supra, 42 Cal.2d at p. 575 [intoxication produced by knowingly taking an overdose of medication prescribed to control his epilepsy could be considered either voluntary or involuntary intoxication]; People v. Chaffey, supra, 25 Cal.App.4th at p. 856 [intoxication caused by knowingly taking 120 Xanax pills to commit suicide was either voluntary or involuntary intoxication, depending on whether defendant had reason to know she would become intoxicated]; People v. Turner (Colo.Ct.App. 1983) 680 P.2d 1290, 1293 [involuntary intoxication was a proper question for the jury where defendant had not been warned of the effects of ingesting excessive doses of a prescription drug and his past experience in taking excessive doses of the drug caused him to believe he would go to sleep, not become intoxicated].)
[9] This legal issue has not been dealt with extensively and there are few published cases in California. Furthermore, the CALCRIM instructions on involuntary intoxication are inadequate. We commend both defense counsel and the trial court for their extensive efforts to decipher  and discuss on the record  the meaning of the law and instructions available to them.