NOTICE
Decision filed 06/09/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 230140-U

NO. 5-23-0140

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Vermilion County. |
| | ) | |
| v. | ) | No. 05-CF-554 |
| | ) | |
| KENNETH GRAY, | ) | Honorable |
| | ) | Mark S. Goodwin, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE SHOLAR delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the judgment of the trial court dismissing petitioner's motion for leave to file successive postconviction petition where petitioner failed to demonstrate that the new evidence in support of actual innocence was of such a conclusive nature that it would probably change the results on retrial.

¶ 2    On November 15, 2021, the petitioner, Kenneth Gray, filed a motion for leave to file a successive postconviction petition for relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). The trial court denied petitioner's motion on January 27, 2023, finding that petitioner lacked a substantive claim for relief. Petitioner now appeals the judgment of the trial court denying his motion for leave to file a successive postconviction petition, claiming the trial court erred by denying petitioner's motion where petitioner claimed actual innocence

1

based upon new evidence that he experienced involuntary intoxication due to the unwarned side effects of taking Zoloft. For the reasons that follow, we affirm the judgment of the trial court.

¶ 3                                    I. BACKGROUND

¶ 4       The facts of this case are set forth fully in *People v. Gray*, No. 4-07-0233, 379 Ill. App. 3d 1090 (2008) (table) (unpublished order under Illinois Supreme Court Rule 23), *People v. Gray*, 2012 IL App (4th) 100038-U, and *People v. Gray*, 2013 IL App (4th) 120970-U.[1] Although this court has thoroughly reviewed the record, our recitation of the facts relies heavily upon the prior orders, and we include only those facts necessary to resolve this appeal. We will recite additional facts in the analysis section as needed to address the specific arguments of the parties.

¶ 5       In September 2005, petitioner was charged with first degree murder in the shooting death of his wife, Kimberly Gray, in violation of section 9-1(a)(1) of the Criminal Code of 1961. 720 ILCS 5/9-1(a)(1) (West 2004). The evidence established the couple had been married for 13 years and had three children. Two days prior to the shooting, Kim took the children and left the marital home, going to stay with her parents. On the day of the shooting, Kim took the children to see petitioner at the marital home. Kim provided daycare in the home for other children, and she wanted to pick up a list containing the names and numbers for the parents of children watched so she could call them and tell them to drop the children at her parents' house the following day. Kim and the children also needed to retrieve clothing and other personal items. Shortly after entering the home, petitioner and Kim began arguing. Petitioner took the daycare list and refused to give it to Kim, telling her that he wanted to make a copy of the list.

¶ 6       Kim sent the children outside and told them to wait for her. Shortly thereafter, Kim exited the house again and told the children that her aunt, Brenda Pellman, would pick them up shortly.

---

[1]Due to redistricting, petitioner's appeal is now properly before the Fifth District.

2

Immediately prior to going home, Kim had asked Pellman to be available to pick up the children if necessary. Pellman was waiting at Kim's grandmother's house less than one-half mile away from the marital home, and she picked the children up after receiving a call from Kim. After arriving back at the grandmother's house, Pellman heard gunshots from the marital home. Shortly thereafter, she saw Kim's parents, Kenny and Kathy Divan, and sister, Katie Divan, drive by on their way to the Gray residence.

¶ 7     Kim's parents and sister arrived at the house as petitioner attempted to back his truck out of the garage. They used their vehicle to block petitioner in the garage. According to the Divans, petitioner exited his truck and pointed a gun in the Divans' direction and shouted something to the effect of, "I shot her. She's gone. I should shoot all of you sons of bitches." Kathy Divan pushed petitioner's gun into the air and rushed past him. Petitioner took off running. The Divans found Kim shot to death in the laundry room leading from the garage to the house. It was later determined that Kim had suffered a total of 16 gunshot wounds: 7 gunshot wounds to the front side of her body, 6 gunshot wounds to the backside of her body, 2 graze wounds, and a gunshot wound to her right hand.

¶ 8     Petitioner ran past the grandmother's house and to a neighbor's house. Upon entering the home and encountering his neighbor, Sheila Fletcher, he told her that he and Kim had been in an argument and that she needed to call 911. Fletcher described petitioner as "polite" and maybe "a little nervous." The 911 operator told Fletcher that petitioner may be armed. In response to Fletcher asking whether he was armed, petitioner took the gun out of his pocket and handed it to Fletcher. The police arrived shortly thereafter. As he walked out the door to surrender to the police, petitioner turned and stated, "Sheila, I just want you to know that Kim cheated on me."

¶ 9     Petitioner was interviewed by the police approximately two hours after the shooting; his video-recorded statement was played for the jury. He told the investigators that the couple engaged in behavior to "spice" up their marriage. This behavior included taking nude photos of Kim and petitioner encouraging Kim to engage in sexual relations with another man, Lee Mincey. After Kim became involved with Mincey, petitioner became insecure and jealous. Petitioner and Kim agreed that Kim would terminate the relationship with Mincey. Over the next six weeks, the marriage continued to deteriorate until Kim took the couple's children and moved out of the marital home. Petitioner told police that, on the day of the shooting, Kim confirmed that she continued seeing Mincey. As they argued, she bragged about the relationship, told petitioner that she had sexual relations with the man hours before, and that she would not let petitioner see the children. Petitioner told police that he retrieved a handgun from the gun cabinet, loaded it, and walked into the kitchen where Kim was standing, holding a clothes basket. Petitioner said that he kept the gun by his side where Kim could not see it. According to petitioner, Kim pointed her finger at him and shouted obscenities. He then raised the gun and pointed it at Kim. Kim screamed and petitioner pulled the trigger. Petitioner told the police that he did not know how many times he fired the gun, but that he thought that the magazine held 15 rounds and that he fired until the gun was empty.

¶ 10     Petitioner told the police that, after the shooting, he reloaded the gun and put it to his head when the phone rang. It was his mother, and he told her that he did something bad. Petitioner then left the house and encountered the Divans. Petitioner did not tell the police that he felt physically threatened by Kim. Neither did he tell the police that within the last couple of weeks, Kim had threatened to kill him with a knife, nor that he woke one night to find her standing over him, holding the gun and pulling the trigger.

4

¶ 11    Petitioner testified on his own behalf at trial. Contrary to what he told the police, petitioner told the jury that approximately two weeks before the shooting, Kim threatened to kill him with a knife, and that he eventually left the house through the bathroom window. Kim was furious because petitioner hid explicit photos and an explicit video of her that he was planning on using for leverage if they got divorced. Petitioner also testified that three days before the shooting, he was awakened by a clicking sound and found Kim standing over him, holding a gun. Petitioner testified that he disarmed her and locked the gun in the gun cabinet.

¶ 12    Petitioner testified that he had gone out drinking the night before the shooting, and that in his drunken state, he put the gun to his head and contemplated suicide. Because the gun was always loaded, they kept the gun safe locked. That night, he put the gun away and did not lock the cabinet. Petitioner testified that on the day of the shooting and during the course of the argument, he twice stopped Kim from getting the gun out of the gun cabinet. After the second attempt, petitioner kept the gun himself and took it with him to find the keys to lock it up again. Petitioner testified that he kept the gun "down by [his] side" because he did not want Kim to "freak out." According to petitioner, Kim continued to argue with him. At one point, Kim threw down a laundry basket and pointed at petitioner, saying "Fuck you; fuck you; fuck you." Petitioner testified that Kim then stated that "she fucked Lee [Mincey] hours before and that his come was still in her pussy." According to petitioner, Kim then grabbed a knife and "came at" him. Petitioner testified that he "just reacted" and started pulling the trigger.

¶ 13    Petitioner admitted that he had not told the police either about Kim coming at him with a knife at the time of the shooting, or the prior instances when she threatened him. Petitioner explained that he started having flashbacks regarding the shooting while in jail, and that is when his memory of what happened that day started to come back to him. After experiencing the

5

flashbacks, petitioner began receiving mental health treatment and was prescribed Zoloft and trazodone. At no point during the trial did petitioner or his family testify that he had previously been prescribed Zoloft or that he started taking Zoloft eight days prior to the shooting.

¶ 14 The law enforcement officers who processed the crime scene testified that they never found a knife. Rod Kaag, an investigator from the sheriff's department, testified that he searched the laundry room where Kim's body was found. Although he did not move either the washer or the dryer, he removed a step ladder next to one of the machines and used it to look over and behind the machines. No knife was found behind, around, or under either the washer or dryer. Another investigator with the sheriff's department, Jerry Lee Davis, likewise testified that he and Kaag looked underneath, at the side, behind, on the top, and on the floor around the washer and dryer. He did not find a knife in that area. Kim's aunt, Brenda Pellman, testified that she and another family member cleaned the crime scene the day after the murder. She explained that during that process, she knocked over a bucket of water. Cleaning up the water required them to move the washer and dryer. She did not find a knife under either appliance.

¶ 15 Petitioner's aunt, Terrie Vaughn, testified that she and petitioner's mother, Molly Galey, went to the Gray home either the day after the shooting or two days after the shooting to get some clothes for petitioner. While retrieving clothes from the dryer, Vaughn stated that she dropped a sock between the dryer and the wall. While retrieving the sock, she found a knife "at the side and toward the back." She retrieved the knife and placed it on the kitchen island. Vaughn testified that she did not mention the knife to petitioner's mother, as she did not think it was significant. Likewise, Vaughn did not report her find to the police, or anyone else, until June 2016, when she learned its significance.

¶ 16     At trial, petitioner attempted to introduce evidence that he suffered from post-traumatic stress disorder (PTSD) after the shooting. Defense counsel argued this testimony would have explained petitioner's testimony regarding the flashbacks that allowed him to recall memories of the shooting that he had not disclosed to the police. Per the defense, the testimony would have further shown that he exhibited symptoms consistent with PTSD at time of his police interview. The State objected to the PTSD testimony, and defense counsel made an offer of proof in the form of testimony from Randall Cunningham and Bryan Manion. Cunningham was a crisis intervention counselor and Manion was a licensed professional counselor. Cunningham noted that petitioner had been prescribed Zoloft. Manion believed petitioner exhibited signs of PTSD, and also noted that petitioner had been prescribed Zoloft. Although petitioner was receiving services from a psychiatrist while in custody, the psychiatrist's diagnosis for petitioner was "major depression, recurrent" and not PTSD. The trial court barred the testimony, finding that neither witness was qualified to diagnose petitioner with PTSD.

¶ 17     Petitioner sought to have the jury instructed on two theories of second degree murder: (1) that at the time of the killing petitioner was acting under a sudden and intense provocation, and (2) that at the time of the killing, petitioner had an unreasonable belief that he needed to act in self-defense. The trial court rejected the defense theory of a sudden and intense provocation. The jury rejected petitioner's claim of second degree murder based upon an unreasonable need for self-defense, and petitioner was found guilty of first degree murder. Petitioner was sentenced to 56 years in the Illinois Department of Corrections, including the 25-year enhancement imposed under section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2004)).

7

¶ 18    On direct appeal, petitioner made the following contentions of error: (1) he was deprived of his right to counsel when the trial court barred him from contact with his attorney during a 75-minute lunch recess that occurred during petitioner's cross-examination; (2) the trial court erred by refusing to instruct the jury on second degree murder based on a sudden and intense passion resulting from serious provocation; (3) the court erred by denying petitioner's motion for a new trial; and (4) the court abused its discretion by sentencing petitioner to 56 years' imprisonment. *People v. Gray*, No. 4-07-0233, 379 Ill. App. 3d 1090 (2008) (table) (unpublished order under Illinois Supreme Court Rule 23). Petitioner's conviction and sentence were affirmed. *Id.*

¶ 19    On September 28, 2009, petitioner filed a postconviction petition, alleging that his trial counsel was ineffective for failing to retain an expert psychiatric witness to examine him and provide testimony regarding PTSD. *People v. Gray*, 2012 IL App (4th) 100038-U, ¶ 17. Petitioner further argued that appellate counsel was ineffective for failing to raise this claim on direct appeal. *Id.* Petitioner argued "such an expert would have supported his theory of defense by showing that he suffered from PTSD, which caused him to lose, and then later recover, memories about the shooting, including that Kim had come at him with a knife." *Id.* ¶ 19. The trial court summarily dismissed petitioner's postconviction petition. *Id.* The Fourth District affirmed the trial court's dismissal of the petition. Although the appellate court found that the issue was forfeited as to trial counsel since it had not been raised on direct appeal, the court also found that the record indicated that "defense counsel investigated a defense based upon PTSD and made strategic choices based upon that investigation." *Id.* ¶ 28. The court also noted that petitioner's treating psychiatrist testified during a posttrial hearing that "he had never diagnosed [petitioner] with PTSD nor had he seen symptoms of PTSD in [petitioner]." *Id.* The appellate court further found that petitioner could not demonstrate prejudice since the physical evidence did not support petitioner's claim that Kim

8

attacked petitioner with a knife since no knife was found at the scene, notwithstanding the testimony of petitioner's aunt that she found a knife and did not report it to the police. *Id.* ¶ 30. Finally, the court noted that "the remaining evidence overwhelmingly supports [petitioner's] first-degree-murder conviction." *Id.* ¶ 31.

¶ 20    In July 2012, petitioner filed his third petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2012)), which was dismissed by the trial court in September 2012. See *People v. Gray*, 2013 IL App (4th) 120970-U, ¶ 2. Although petitioner alleged a variety of trial and sentencing errors in his petition, on appeal, petitioner only alleged that his sentence was void, contending that the trial court did not have the authority to order him to serve 100% of the 25-year firearm enhancement. *Id.* ¶ 11. The Fourth District rejected this claim and affirmed the trial court. *Id.* ¶ 24.

¶ 21    On October 21, 2021, petitioner filed a motion for leave to file a successive postconviction petition for relief, along with his proposed petition and supporting documentation. Petitioner claims that two facts, not known at the time of his trial, support his claim of actual innocence: (1) he has a genetic mutation that prevents him from metabolizing drugs like Zoloft (sertraline), and (2) that there is evidence that Zoloft can cause a propensity for violence. In his filings, petitioner asserts that he is actually innocent of the charges based upon the affirmative defense of involuntary intoxication. In support of his claim, petitioner relies on *People v. Hari*, 218 Ill. 2d 275 (2006). In *Hari*, the Illinois Supreme Court found that "an unexpected adverse side effect of a prescription drug that was unwarned by the prescribing doctor, the [Physicians' Desk Reference] or the package insert *** is 'involuntarily produced' within the plain meaning of the involuntary intoxication affirmative defense statute." *Id.* at 292.

¶ 22    Petitioner now asserts that he was prescribed Zoloft by his family physician two years prior to the offense, but that he had not taken the medication. Petitioner says that he kept the Zoloft and that he first started to take it eight days prior to the shooting. In support of his claim, petitioner submitted several affidavits, including an affidavit from Randall Cunningham, the crisis intervention counselor who prepared petitioner's "Biopsychosocial Assessment" in November 2005, while petitioner was incarcerated and awaiting trial. Cunningham's affidavit states that petitioner "specifically stated that he had only taken Zoloft for one week immediately prior to the incident involving his wife." The "Biopsychosocial Assessment" was included with petitioner's pleadings.

¶ 23    Petitioner also included nine affidavits from family members and friends. The affidavits generally state that, in September 2005, family members and close friends were concerned about petitioner's excessive drinking and his failure to take prescribed medications. As a result, they participated in an intervention with petitioner on the Sunday one week prior to the shooting. Various affidavits attest that petitioner agreed to quit drinking and take his medication. Petitioner's own affidavit states that the intervention was very emotional, that he promised that he would never drink again, and that he in fact never drank again. Petitioner also states that he began using his two-year-old Zoloft prescription at the time of the intervention, and that with hindsight, the medication intensified his feelings. Petitioner states that the medication made him feel paranoid and suicidal, gave him anxiety and "caused him to think aggressively, unusually, incoherently and most importantly, it blocked some of his memories." Petitioner states he was not aware that Zoloft could cause these effects until speaking with his psychiatrist, Dr. Scott McCormick.

¶ 24    Petitioner attached a number of medical reports to his successive postconviction petition. A "Mental Health Progress Report" dated July 23, 2014, and signed by Dr. McCormick notes that

10

petitioner "has had several negative reactions to antidepressants. Zoloft made his [*sic*] severely manic as I previously suspected. Unfortunately, he received no GBMI or NGRI consideration at trial." Dr. McCormick changed petitioner's diagnosis to "bipolar disorder with a history of psychotic mania." Petitioner's medications were changed.

¶ 25    Petitioner's motion for leave to file a successive postconviction petition also states that DNA testing for the genetic mutation that determines whether an individual is susceptible to the adverse effects of Zoloft was not available until 2014, and that his own DNA was not tested for the mutation until June 2019, with the results being provided in October 2020.

¶ 26    Petitioner attached an independent forensic report prepared by Dr. Selma Eikelenboom-Schieveld, M.D., Ph.D. In her 2020 report, Dr. Eikelenboom-Schieveld noted that "[t]here is a body of evidence that psychoactive medication in general and antidepressants in particular can cause acts of violence like suicide and homicide" and "[m]ost likely this is linked to toxic effects of the medication." Dr. Eikelenboom-Schieveld's report specifically addressed antidepressants like Zoloft (sertraline) which are known as "Selective Serotonin Reuptake Inhibitors" (SSRIs). Based upon genetic testing of petitioner, Dr. Eikelenboom-Schieveld concluded that petitioner has genetic variations that cause him to be unable to metabolize sertraline at the same rate as an average person without the variations, meaning that petitioner is vulnerable to the accumulation of sertraline in the blood and, consequently, for an increased chance of sertraline toxicity. More specifically, petitioner falls into a category of people that Dr. Eikelenboom-Schieveld refers to as "intermediate metabolizers." This is because petitioner has one genetic variation which causes him to metabolize sertraline faster than a normal metabolizer, but he also has another genetic variation that causes him to metabolize sertraline slower than a normal metabolizer. Because the latter gene is responsible for 20% of sertraline metabolization and the former gene is only responsible for 8%

11

of sertraline metabolization, petitioner has a net loss of the ability to metabolize sertraline at the same rate as a normal metabolizer. Dr. Eikelenboom-Schieveld states that, because petitioner now has been diagnosed as bipolar and suffering from mood swings as opposed to the prior diagnosis of depression, the prescribing of an antidepressant such as Zoloft, in the absence of a mood stabilizing drug, could trigger a manic reaction. According to Dr. Eikelenboom-Schieveld, adverse side effects from SSRIs are most likely to occur at the start of treatment, when the dosage is increased or decreased, and when the medication is discontinued.

¶ 27 Based upon the information she was provided,[2] Dr. Eikelenboom-Schieveld concluded that the results of her investigation "strongly support the hypothesis that Mr. Gray shot his wife while he was involuntarily intoxicated by the medication sertraline *** to such a degree that it deprived him of the substantial capacity to appreciate the criminality of this conduct or to conform his conduct to the requirements of the law." This conclusion was supported, in part, by petitioner's medical history from the Illinois Department of Corrections which demonstrated occasions where petitioner suffered from the adverse side effects of psychoactive medication, only to have those symptoms abate when his dosage was reduced or he stopped taking the medications. Dr. Eikelenboom-Schieveld's report states that "[i]f new information comes it [*sic*], [she] might need to adjust [her] opinion."

¶ 28 Petitioner also attached a forensic report, dated November 13, 2020, from Dr. Judy K. Osgood, Ph.D., a licensed clinical psychologist. In 2001 and 2003, Osgood provided three

---

[2]The report indicates Dr. Eikelenboom-Schieveld received records "which contained, among others, his medical records from his general practitioner, Dr. Dionko, M.D., from 1993-2003, records from psychologist Dr. Osgood, Ph.D., covering 2003, witness statements, [petitioner's] Illinois Department of Corrections disciplinary card, mental health progress notes from several psychiatrists, e.g. Dr. McCormick, Dr. Tiegland, Dr. Sangster, Dr. Urubusi, Dr. Nielson, Dr. Tennenbaum, progress notes until February 2020, and several CDs with video footage of [petitioner's] interrogation at the time of his arrest." The report made no mention of the Biopsychosocial Assessments prepared by Randall Cunningham.

individual counseling sessions and three marital therapy sessions with petitioner and Kim. The report notes petitioner's family provided Osgood with extensive medical records regarding petitioner's treatment since his incarceration and included Dr. Selma Eikelenboom-Schieveld's report. After reviewing the information provided by petitioner and his family, Dr. Osgood concluded, based upon a reasonable degree of professional certainty, "that Ken Gray experienced involuntary intoxication from the impact of Zoloft on his brain chemistry to such a degree with the potential to have deprived him of the substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law resulting in Ken having murdered his wife."

¶ 29    On January 27, 2023, the trial court denied petitioner's motion for leave to file successive postconviction petition, noting:

> "The Defendant fails to meet his burden in his motion seeking leave to file the successive post-conviction petition he desires to file. The Defendant seeks only to re-litigate claims that he raised previously in his numerous post-judgment proceedings that have all been denied or dismissed. Clearly, neither cause and prejudice nor a fundamental miscarriage of justice can be seen in the voluminous filings by this Defendant. The Defendant continues to lack a substantive claim for relief before this Court despite repeated attempts at recasting his arguments."

¶ 30    Petitioner filed a timely notice of appeal.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, petitioner maintains that his successive postconviction petition raises a colorable claim of actual innocence based upon new evidence demonstrating that he was experiencing involuntary intoxication due to the side effects of Zoloft. Consequently, petitioner argues the trial court erred by denying his motion for leave to file a successive postconviction petition. For the reasons that follow, we disagree and affirm.

13

¶ 33　We review the denial of leave to file a successive postconviction petition alleging actual innocence *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 40. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2024)) provides a remedy to a criminal defendant whose federal or state constitutional rights were substantially violated in his original trial or sentencing hearing. *People v. Pistonbarger*, 205 Ill. 2d 444, 455 (2002). Proceedings brought under the Act are collateral proceedings, rather than an appeal of the underlying judgment. *Id.* Accordingly, only constitutional issues that were not and could not have been adjudicated on direct appeal are considered. *Id.* at 456. "[I]ssues that were raised and decided on direct appeal are barred from consideration by the doctrine of *res judicata*; issues that could have been raised, but were not, are considered waived." *Id.* The Act contemplates the filing of only one postconviction petition. *Id.* Successive postconviction petitions are disfavored by the courts. *People v. Edwards*, 2012 IL 111711, ¶ 29. "Any claim of substantial denial of constitutional rights not raised in the original or an amended [postconviction] petition is waived." 725 ILCS 5/122-3 (West 2024). The strict application of the statutory bar against successive postconviction petitions is relaxed on two grounds. *Robinson*, 2020 IL 123849, ¶ 42 (citing *Edwards*, 2012 IL 111711, ¶ 22). "The first is where the petitioner can establish cause and prejudice for the failure to assert a postconviction claim in an earlier proceeding." *Id.* (citing *Edwards*, 2012 IL 111711, ¶ 22). "The second is where the petitioner asserts a fundamental miscarriage of justice based on actual innocence." *Id.* (citing *Edwards*, 2012 IL 111711, ¶ 23).

¶ 34　"Prior to commencing a successive postconviction petition, a petitioner must obtain leave of court." *Id.* ¶ 43 (citing *Edwards*, 2012 IL 111711, ¶ 24). Substantively, a petitioner claiming actual innocence need not show cause and prejudice. *People v. Ortiz*, 235 Ill. 2d 319, 330-31 (2009). Rather, a petitioner must support his claim of actual innocence with evidence that is "newly

discovered; material and not merely cumulative; and 'of such conclusive character that it would probably change the result on retrial.' " *Id.* at 333 (quoting *People v. Morgan*, 212 Ill. 2d 148, 154 (2004)).

¶ 35    "A request to file a successive petition based on actual innocence is reviewed under a higher standard than that applicable to the first stage for an initial petition, which only requires that the petition is not frivolous or patently without merit." *Robinson*, 2020 IL 123849, ¶ 43 (citing *Edwards*, 2012 IL 111711, ¶¶ 25-29). "If leave to file is granted, a successive petition is docketed for second-stage proceedings, at which the petitioner must make a substantial showing of actual innocence to warrant an evidentiary hearing." *Id.* (citing *People v. Sanders*, 2016 IL 118123, ¶¶ 25-28). "The substantial showing required to avoid dismissal at the second stage is greater than the standard that must be satisfied to obtain leave to file a successive petition." *Id.* (citing *People v. Smith*, 2014 IL 115946, ¶ 29).

¶ 36    "A request for leave to file a successive petition should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Robinson*, 2020 IL 123849, ¶ 44. The trial court should grant leave to file the new postconviction petition "where the petitioner's supporting documentation raises the possibility that is it more likely than not that no reasonable juror would have convicted the petitioner in light of the new evidence." *Id.* "At the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true. [Citations.] In deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations." *Id.* ¶ 45.

15

¶ 37    "To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Id.* ¶ 47 (citing *Edwards*, 2012 IL 111711, ¶ 32). "Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence." *Id.* (citing *People v. Coleman*, 2013 IL 113307, ¶ 96). "Evidence is material if it is relevant and probative of the petitioner's innocence." *Id.* (citing *Coleman*, 2013 IL 113307, ¶ 96). "Noncumulative evidence adds to the information that the fact finder heard at trial." *Id.* (citing *Coleman*, 2013 IL 113307, ¶ 96). "Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Id.* (citing *Coleman*, 2013 IL 113307, ¶ 96). "The conclusive character of the new evidence is the most important element of an actual innocence claim." *Id.* (citing *People v. Washington*, 171 Ill. 2d 475, 489 (1996)).

¶ 38    "Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 48 (citing *Coleman*, 2013 IL 113307, ¶ 97). "The new evidence need not be entirely dispositive to be likely to alter the result on retrial." *Id.* (citing *Coleman*, 2013 IL 113307, ¶ 97). "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* (citing *Coleman*, 2013 IL 113307, ¶ 97).

¶ 39    The "actual innocence exception to the bar on successive postconviction petitions is met only where the defendant can prove all of the elements of a freestanding claim of actual innocence." *People v. English*, 403 Ill. App. 3d 121, 133 (2010). Petitioner contends that he has met all the conditions for setting forth a colorable claim of actual innocence. We need not address

16

whether petitioner's evidence is newly discovered, material and not cumulative because we conclude that, even assuming the first two prongs of the actual innocence test have been met, the evidence is not of such a conclusive character that it would probably change the result on retrial. See *Sanders*, 2016 IL 118123, ¶ 47 (finding it is appropriate to address only one element of the actual innocence test if that element is dispositive). As noted above, "[t]he conclusive character of the new evidence is the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47 (citing *Washington*, 171 Ill. 2d at 489).

¶ 40 As we consider the motion for leave to file a successive petition, the attached affidavits, and the information contained therein that is contradicted by the evidence produced at trial, we are mindful that the Illinois Supreme Court "has never held that a request for leave to file a successive petition must be denied if the new evidence conflicts with the trial evidence." *Id.* ¶ 57. Indeed, as the *Robinson* court noted, such a requirement would be illogical since new evidence of actual innocence inherently contradicts the evidence of a petitioner's guilt at trial. *Id.* We are also mindful of the fact that that "[a]t the pleading stage of postconviction proceedings, all well-pleaded allegations in the petition and supporting affidavits that are not positively rebutted by the trial record are to be taken as true," and that "[i]n deciding the legal sufficiency of a postconviction petition, the court is precluded from making factual and credibility determinations." *Id.* ¶ 45.

¶ 41 Nevertheless, this court is not required to consider petitioner's allegations and supporting documentation in a vacuum. Even taking all well-pleaded allegations as true, in order to determine whether the conclusive nature of the new evidence undermines the court's confidence in the judgment of guilt, this court must consider the trial court record in considering the probability of whether the fact finder would reach a different result after considering the new evidence. After

17

reviewing the record, we find petitioner's new evidence is not so conclusive that it would probably change the result on retrial.

¶ 42    Petitioner essentially asks this court to find that it is more likely than not that a jury would choose to disregard significant contradictions and omissions between his latest claims and the evidence produced at trial. For example, the trial testimony regarding the events occurring on the Sunday one week before the homicide dealt exclusively with petitioner's aunt, Polly Galey, counseling petitioner and Kim regarding their ongoing marital problems. The trial testimony omitted any mention of an intervention involving several of petitioner's family members and friends who were concerned about his alcohol consumption and his failure to take prescribed medication. Also absent from petitioner's defense at trial is any mention of his current claim that, as a consequence of the intervention, he never drank alcohol again and started taking a two-year-old prescription for Zoloft. To the contrary, at trial, the defense presented evidence that petitioner was drinking alcohol on the Friday night and the Saturday night prior to the shooting on Sunday afternoon. Specifically, petitioner testified that, on Saturday night, he went to a bar with his mother, Aunt Polly, and another aunt, Terrie Vaughn. While at the bar, petitioner discussed with them the prior incidents of Kim attacking him. After leaving the first bar, petitioner visited another bar with his cousin, staying at the second bar until it closed. Petitioner testified that he drank "[a] lot of beer" before returning home and contemplating suicide.

¶ 43    Turning to Dr. Eikelenboom-Schieveld's report, we note that her conclusion that there is strong support for the hypothesis that petitioner was involuntarily intoxicated as a result of the side effects of Zoloft, is based in part on the premise that "[n]o other substance that could have caused the [negative] reaction should have been taken at the time of the reaction." She further notes that "[t]his refers to alcohol and drug use, neither of which [petitioner] was on during the shooting."

18

Although there was no trial testimony that petitioner was consuming alcohol at the time of the shooting, petitioner's own testimony established that he was drinking heavily within hours of doubling his Zoloft dosage, which was about six hours prior to the shooting. Thus, it would appear that this was information that was withheld from, or certainly not considered by, Dr. Eikelenboom-Schieveld in reaching her conclusion.

¶ 44　Furthermore, petitioner's documentation in support of his motion for leave to file a successive postconviction petition not only contradicts evidence that was presented at trial, but the documentation also contains internal inconsistencies that impact our decision. Again considering Dr. Eikelenboom-Schieveld's report, we note, understandably, that she received and relied upon records provided by petitioner. Based upon these records, Dr. Eikelenboom-Schieveld reports that petitioner "has no history of violent behavior" and that "[i]t is not until he was 34 [years old] and put on medication that he developed violent behavior. That makes it unlikely his mood swings were the reason he became violent or that he was suffering from an undiagnosed disorder." We note, however, that these statements from Dr. Eikelenboom-Schieveld's report are rebutted by medical records contained in the trial court record and provided by petitioner in this and various other postconviction filings. For example, in the office notes from petitioner's August 26, 2003, visit to Dr. Diokno (the visit that led to petitioner being provided with a "Zoloft Pack"), petitioner self-reported that he has "a bad temper" and that he "gets set off very easily." This document was filed in the trial court as a part of petitioner's current motion for leave to file. Another document, filed as a part of petitioner's 2009 petition for relief from judgment, is signed by Randall Cunningham, the crisis intervention counselor who first prepared petitioner's "Biopsychosocial Assessment" in November 2005. This document is dated November 9, 2005, and notes, in the history section, that petitioner has a "bad temper – rage – frequent fights in the past." Finally, the

"Biopsychosocial Assessment" prepared by Cunningham and dated November 17, 2005, makes note of petitioner's history of property destruction, violence and aggression to others, including specifics of "throwing + breaking things" and a "couple of fights." Elsewhere in the document, it is noted that petitioner was "kicked out" of school "for fighting a couple of times," and that petitioner has a prior diagnosis of bipolar and a "[h]istory of anger issues, violent outbursts."

¶ 45   Another example of an internal consistency can be found in Cunningham's affidavit. Cunningham states that petitioner "specifically stated that he had only taken Zoloft for one week immediately prior to the incident involving his wife." As noted above, the "Biopsychosocial Assessment" was included with petitioner's filings, and it contains, under a typed heading of "Last Date Used," the following hand-written notes: "2-3 years ago prescribed." Underneath this notation is a hand-drawn arrow drawn pointing to handwritten notes (appearing under the "Prescribing Physician") "one week before." An alternative, but fair, reading of this medical record suggests the opposite of petitioner's and Cunningham's claim that he started taking Zoloft one week prior to the homicide, and instead suggests that he stopped taking Zoloft one week prior to the shooting.

¶ 46   Even considering the new evidence, the evidence of petitioner's guilt is overwhelming. Petitioner's own testimony established that he could not get the affair out of his mind, that he traveled into town with Kim, checked her caller ID, and kept personal photos from her as "leverage" for counseling or a divorce. He refused to give Kim the daycare client list for the same reason. Petitioner admitted driving by Mincey's house on multiple occasions, and on the day of the shooting and in response to his argument with Kim, was going to take the nude photos of Kim and go confront Mincey. On cross-examination, petitioner admitted telling his best friend that, "I'm going to end up killing [Kim]." According to the timeline given at trial and in the current

20

motion for leave, this conversation took place prior to the intervention. Petitioner's medical records establish that he has a history of getting set off easily, violence and rage—all occurring prior to his starting the Zoloft prescription one week before the shooting. In other words, petitioner's history of violence and rage is well-documented as occurring before he began using Zoloft.

¶ 47 Even assuming, as we are required, that the well-pleaded facts contained in petitioner's motion for leave to file and its supporting documentation are true, we conclude that the newly discovered evidence, specifically that petitioner is an intermediate metabolizer of Zoloft which could lead to a state of involuntary intoxication, is not of such a conclusive character that it is more likely than not that no reasonable juror would find petitioner guilty beyond a reasonable doubt. Having failed to meet the third, and most important, prong of the test for actual innocence, we find that the trial court properly denied petitioner's motion for leave to file a successive postconviction petition.

¶ 48 Finally, petitioner argues that his actual innocence claim implicates sentencing considerations and asks this court to consider the impact of petitioner's claim of actual innocence in regards to sentencing. Petitioner notes that he filed a letter with the clerk of the circuit court on January 3, 2022. The letter is addressed to the Vermilion County State's Attorney, and is captioned, "Letter Seeking Motion to Resentence by the People in the Interest of Justice Pursuant to 725 ILCS 5/123 [*sic*]." Although the fact that this letter was mentioned in the trial court's order denying petitioner's motion for leave to file, the trial court never ruled on the letter, nor could it.

¶ 49 Petitioner's letter to the Vermilion County State's Attorney is an attempt to persuade the State to exercise its discretion to seek resentencing for petitioner under section 122-9 of the Act. 725 ILCS 5/122-9 (West 2024). In pertinent part, that statute provides as follows:

> "At any time *upon the recommendation of the State's Attorney* of the county in which the defendant was sentenced, *the State's Attorney may petition the*

21

*sentencing court or the sentencing court's successor to resentence the offender* if the original sentence no longer advances the interests of justice. The sentencing court or the sentencing court's successor may resentence the offender if it finds that the original sentence no longer advances the interest of justice." (Emphases added.) *Id.* § 122-9(b).

¶ 50    Petitioner's motion for leave to file his successive postconviction petition did not raise this issue. Instead, for the first time on appeal, petitioner attempts to graft this claim onto his motion for leave to file, arguing that "even if a trier of fact decided that [petitioner's] Zoloft intoxication *** at the time of the offense did not nullify his criminal liability, the sentencing judge could still consider that evidence of Zoloft intoxication as a mitigating factor." In support of this argument, petitioner cites to section 9-1(c)(2) of the Criminal Code of 1961 (720 ILCS 5/9-1(c)(2) (West 2000)) which provided, at the time, that in considering any aggravating and any mitigating factors which are relevant to the imposition of the death penalty, the court (or jury) shall consider, as a mitigating factor, that "the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense." *Id.*

¶ 51    Petitioner argues that this sentencing claim would satisfy the cause and prejudice test for a successive postconviction petition. Specifically, petitioner argues that cause exists because he only recently discovered this new evidence, and that prejudice exists in the form of a due process violation "because extreme mental or emotional disturbance that does not rise to the level of an affirmative defense is a statutory mitigating factor that does not rise to the level of an affirmative defense is a statutory mitigating factor that must be considered by the court."

¶ 52    As noted, petitioner's argument here relies upon section 9-1(c)(2) as enacted at the time of the offense, which pertains to factors in mitigation that were required to be considered by the fact finder in determining whether to impose the death penalty. *Id*. This was not a death penalty case.

22

¶ 53    We decline petitioner's invitation to consider this claim. As noted above, petitioner filed a letter directed to the Vermilion County State's Attorney. It was not a motion that the trial court could consider or rule upon in the absence of a motion from the State. Petitioner did not seek to amend his motion for leave to file a successive postconviction petition. Perhaps this issue could have been raised in the trial court, but it was not. Accordingly, we find this issue waived. *People v. Montanez*, 2023 IL 128740, ¶ 88 ("it is a well-settled proposition that postconviction petitioners may not raise claims on appeal that were not included in their motions for leave to file or in their proposed successive petitions").

¶ 54                                III. CONCLUSION

¶ 55    For the foregoing reasons, we affirm the Vermilion County trial court's denial of petitioner's motion for leave to file a successive postconviction petition.


¶ 56    Affirmed.